# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ASTELLAS PHARMA INC., ASTELLAS IRELAND CO., LTD., and ASTELLAS PHARMA GLOBAL DEVELOPMENT, INC., <br><br> Plaintiffs, <br><br> v. <br><br> LUPIN LTD., LUPIN PHARMACEUTICALS, INC., ZYDUS PHARMACEUTICALS (USA) INC., and ZYDUS LIFESCIENCES LIMITED, <br><br> Defendants. | C.A. No. 23-819-JFB-CJB |

**DEFENDANTS' LETTER TO THE HONORABLE CHRISTOPHER J. BURKE**
**REGARDING ORAL ORDER (D.I. 179) ON POST-HEARING BRIEFING**

Astellas has failed to carry its "extraordinary burden" to demonstrate that it is entitled to a preliminary injunction because (1) Defendants have raised multiple substantial questions of invalidity and (2) Astellas has failed to demonstrate a likelihood of success on infringement, each of which alone provides an independent basis to deny Astellas's motion.

I. **Under both sides' claim constructions, the Asserted Claims are indefinite because a POSA would be unable to determine whether an accused product infringes.**

Astellas's motion should be denied because Defendants have raised at least a "substantial question" as to indefiniteness of the Asserted Claims. *See Entergris, Inc. v. Pall Corp.*, 490 F.3d 1340, 1351 (Fed. Cir. 2007) ("If the alleged infringer raises a 'substantial question' regarding invalidity, . . . the preliminary injunction should not issue.") (internal citations omitted).

The claims must be construed consistent with the intrinsic evidence—the patent claims, specification, and prosecution history. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314-19 (Fed. Cir. 2005). But here the claims are confusing. A POSA would be unable to evaluate infringement based on the intrinsic evidence. Therefore, the claims are invalid as indefinite. *See Dow Chem. Co. v. Nova Chems. Corp. (Canada)*, 803 F.3d 620, 634 (Fed. Cir. 2015) (resolving that "the existence of multiple methods leading to different results without guidance in the patent or the prosecution history as to which method should be used renders the claims indefinite").

Astellas tries to avoid this inevitable result by taking what the Court recognized as an "unusual" approach: offering claim constructions that ignore the explicit definitions and disclosures set forth by the patentees. (Tr.[1] (Astellas Op.) at 43:15-43:20.) The fact that the patentees need to run from the definitions in their own patent demonstrates that these conflicting definitions render the claims indefinite. The Federal Circuit "repeatedly and consistently has recognized that courts may not redraft claims, whether to make them operable or to sustain their validity." *Rembrandt Data Techs., LP v. AOL, LLC*, 641 F.3d 1331, 1339 (Fed. Cir. 2011).

A. **The Asserted Claims are indefinite under both sides' analysis of "treating is with a reduced food effect" and "reduced food effect."**

The key issue regarding the "reduced food effect" terms is the meaning of "reduced." While the parties agree that a POSA would know what a "food effect" is generally,[2] the same is not true for the scope of a "*reduced* food effect." There is no accepted definition in the art for "reduced food effect," nor is there an express definition in the specification. (Tr. (Savic) at 215:1-16, (Chambliss) at 283:8-12; D.I. 124 at ¶ 67; D.I. 121 at ¶ 240.) Instead, the specification provides a POSA with alternative definitions for the related terms "the effects by food are reduced" and "formulation in which the effects by food are reduced" and Example 10, the only disclosure comparing food effects between sustained release and immediate release mirabegron formulations. (Ex. 1[3] at 7:57-8:39, 44:6-46.) None of these provide a POSA with sufficient information to understand the scope of the "reduced food effect," and the claims are indefinite.

---

[1] Citations to "Tr." refer to the preliminary injunction hearing transcript.
[2] Food effect refers to differences in the absorption of a drug when taken with food as opposed to an empty stomach. (Tr. (Taft) at 95:6-13, (Savic) at 212:16-213:7; DDX2-8.)
[3] Citations to "Ex." refer to the exhibits submitted with the preliminary injunction briefing.

**1. The alternative definitions include many ways to quantify a "reduced food effect," including unrelated *in vitro* (laboratory) and *in vivo* (in the human body) test methods**. (Ex. 1 at 7:57-8:39; Tr. (Savic) at 215:9-216:23, (Chambliss) at 283:13-284:16; D.I. 124 at ¶¶ 67-71; D.I. 121 at ¶¶ 240-43.) This leaves a POSA unable to determine which tests to run and which results are necessary to evaluate whether a sustained release mirabegron product infringes the Asserted Claims. (Tr. (Savic) at 216:24-217:23, (Chambliss) at 288:3-290:14; D.I. 124 at ¶¶ 71-74, 81-82; D.I. 121 at ¶¶ 243-47.) Astellas appears to concede as much and instead asks this Court to ignore these definitions as related to other embodiments, although it offers no evidence in support of this argument. (D.I. 141 at 2-3; Tr. (Astellas Op.) at 44:16-45:8.) Neither *Howmedica Osteonics Corp. v. Wright Medical Technology, Inc.*, 540 F.3d 1337 (Fed. Cir. 2008) nor *Ventana Medical Systems, Inc. v. Biogenex Laboratories, Inc.*, 473 F.3d 1173 (Fed. Cir. 2006), which Astellas relies on, support this proposition as neither case addresses whether a patentee can ignore express definitions offered for terms appearing in the claims it asserts. (D.I. 141 at 2-3.)

**2. Example 10 does not provide enough information to understand the bounds of "reduced food effect."** Astellas argues that Example 10 "expressly describes the 'reduced' aspect of this term" and that any lack of information in Example 10 may be ignored because a POSA could replicate Example 10 in view of FDA Guidance (Ex. 15). (D.I. 141 at 4, 7.) Not so.

Example 10 does not provide enough information for a POSA to determine what changes in pharmacokinetic parameters (*e.g.*, $C_{max}$ and AUC) constitute a "reduced food effect." (Ex. 1 at 44:6-46; D.I. 124 at ¶¶ 75, 100-02; Tr. (Savic) at 233:9-24, 218:10-219:15, (Chambliss) at 291:2-15; D.I. 121 at ¶¶ 266-67.) For example, a POSA would not know how to determine whether a food effect is "reduced" when those parameters move in different directions, as they do in Example 10. (Ex. 1 at 44:31-36 (formulation 1B showing rate of decrease of 10% for $C_{max}$ but - 4%, *i.e.*, a 4% increase, for AUC); Tr. (Savic) at 217:13-23; DDX2-17[4]; D.I. 124 at ¶ 72.)

The specification lacks the information necessary to replicate the "food effect study" in Example 10 (as demonstrated by Astellas's attempt to import the FDA Guidance into Example 10).[5] (Tr. (Savic) at 218:1-9.) Example 10 is missing key parameters—for example, meal composition (food type and fat content) and study population (gender, ethnicity, national origin, and age)—needed to determine if a formulation meets the "reduced food effect" terms, which are absent from the FDA Guidance and would directly influence the outcome of any study. (Tr. (Savic) at 218:10, 220:1, 223:5-224:19; D.I. 124 at ¶¶ 77-78.) Example 10 also compares 160 mg immediate release to 200 mg sustained release without any explanation why different doses were used or how to compare other dosage amounts when evaluating infringement (*e.g.*, 25 or 50 mg sustained release). (Tr. (Savic) at 218:10-219:15; D.I. 124 at ¶ 86.)

Astellas argues Defendants have not presented evidence that any of the information missing from Example 10 "actually do[es] impact the results." (D.I. 141 at 7.) Astellas's own data confirms that differences in meal content and study population impact the resulting pharmacokinetic parameters and infringement analysis. For example, a comparison of the high fat versus low fat meal data in the same studies demonstrated a marked difference in $C_{max}$ and AUC. (DDX2-35, Tr. (Savic) at 241:6-242:6, (Taft) at 144:9-19; D.I. 124 at ¶¶ 111-12.) Administration of the same

---

[4] DDX1-, DDX2-, and DDX3- refer respectively to Exs. A, B, and C of D.I. 180.

[5] In fact, a POSA could never replicate Example 10 according to the guidance, because Example 10 was two studies, not one, neither of which complied with the FDA Guidance. (Tr. (Taft) at 136:19-140:22, (Savic) at 220:7-221:5; D.I. 124 at ¶¶ 75-76, fn. 2; DDX2-19; Ex. 15.)

immediate release tablet to different groups of people (within the same study) demonstrated a >10% difference in $C_{max}$. (Tr. (Chambliss) at 288:13-290:5; Ex. 24 at ASTMIRA_00040604; DDX3-19.) These inherent differences could lead to opposite conclusions as to whether a particular formulation exhibits a "reduced food effect." (Tr. (Chambliss) at 290:6-14.)

Astellas cannot rely on the FDA Guidance to fill gaps in the specification. The patent contains no reference to the guidance, much less to interpret "reduced food effect." (*See generally* Ex. 1; Tr. (Savic) at 218:1-9, 222:21-223:4.) This extrinsic evidence cannot be used to override the intrinsic evidence. *See Phillips*, 415 F.3d at 1319 ("extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence"). Example 10 does not provide sufficient information for a POSA to determine whether the patentees complied with the FDA Guidance, and therefore a POSA could not conclude that the guidance provides any information useful for replicating Example 10. (Tr. (Savic) at 217:24-218:9, 242:7-13; DDX2-18.) The FDA Guidance does not even contemplate comparisons between different formulations, providing guidelines only for evaluating food effect of a single formulation. (Ex. 15 at DEFS-MIRAII-000867-68.)

This case closely resembles *Forest Lab'ys, Inc. v. Teva Pharms. USA, Inc.*, where the court invalidated patent claims requiring a comparison between pharmacokinetics of sustained and immediate release formulations of the same drug because the patent specification lacked details about how to design the clinical study and because human pharmacokinetics are so variable that the pharmacokinetic results would change with each group of subjects. No. 14-121-LPS, 2016 WL 54910, at *6-*9 (D. Del. Jan. 5, 2016), *aff'd* 716 Fed. Appx. 987, 992-94 (Fed. Cir. 2017). In finding the claims indefinite, the court rejected an argument that a POSA could look at a single clinical study described in the prosecution history and fill in any details from the prior art to provide a basis for making the comparison. *See id*. at *9.

**3. The claims remain indefinite under Astellas's proposed constructions.** Astellas offers *two different* constructions for "reduced food effect" depending on its location within the claim: (1) "a method for treating overactive bladder without clinical impact by food" and (2) "the food effect observed after oral administration for the sustained release formulation of mirabegron is compared to the food effect observed after oral administration of an immediate release formulation of mirabegron." (D.I. 99 at 4-5, 6-7.) This violates a cardinal rule: "a claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001).

The phrase "clinical impact" in Astellas's first construction does not appear in the patent, nor does Astellas provide a methodology to measure this term. (Tr. (Taft) at 149:22-150:2; *see generally* Ex. 1.) The patent does not tell a POSA what "clinical impact" means, how it should be measured, or how to compare clinical impacts between two formulations when evaluating infringement. (*Id*.)

Astellas's second construction omits the term "reduced." *See Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1257 (Fed. Cir. 2010) (claims must be "interpreted with an eye toward giving effect to all terms in the claim") (internal quotations and citations omitted). Astellas never identifies how its construction would measure a "reduction" in food effect, instead proposing a "comparison" with no reduction required. *See Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370-71 (Fed. Cir. 2014) (when a patent claim uses a "term of degree" the POSA must be able to ascribe a precise standard for its measurement). The same issues discussed above

3

regarding insufficient disclosure of study design and how to determine a "reduction" when pharmacokinetic parameters move in different directions likewise apply to Astellas's proposal.

> B. **The Asserted Claims are indefinite regardless of the construction of "immediate release formulation."**

The parties' main dispute for this term is whether the POSA has enough information to identify what qualifies as an immediate release comparator.

**1. It is undisputed that the specification provides three different definitions for "immediate release formulation" after the phrase "as used herein."** (Tr. (Taft) at 147:18-148:8, (Little) at 182:15-183:4, (Savic) at 226:22-227:20, (Chambliss) at 279:13-280:9; D.I. 124 at ¶ 84; D.I. 121 at ¶ 229; Ex. 1 at 7:25-49; *see also* Tr. (Astellas Op.) at 30:17-20 ("[Y]ou look at the definition section, they say those definitions conflict. And we agree, they are different definitions . . . .").) These definitions set forth different criteria regarding how the comparator formulation would be released in the human body, be absorbed, and interact with food. (Tr. (Savic) at 227:21-228:5; D.I. 124 at ¶ 85.) Because the requirements of each definition are inconsistent and not coextensive, a POSA would not know whether the appropriate comparator for the Asserted Claims must meet one, two, or all three definitions. (Tr. (Savic) at 228:6-229:16, (Chambliss) at 286:1-288:2; D.I. 124 at ¶¶ 84-88; D.I. 121 at ¶ 230.) Thus, a POSA might determine a formulation to be infringing based on one comparator definition and noninfringing based on a different comparator definition, rendering the Asserted Claims indefinite. (Tr. (Savic) at 228:24-229:16; *see Dow Chem. Co.*, 803 F.3d at 634.)

**2. Astellas's efforts to avoid the intrinsic evidence are legally and factually incorrect.** *Abbott Laboratories v. Syntron Bioresearch, Inc.*, 334 F.3d 1343, 1354-55 (Fed. Cir. 2003), does not hold that a Court may ignore multiple express definitions in a patent in favor of "plain and ordinary meaning" if the term and definitions are confusing to a POSA. (Tr. (Astellas Op.) at 31:4-20.) Rather, the *Abbott* court was asked to choose between two related express definitions in the specification and selected the broader definition, relying on how the term was defined in extrinsic technical dictionaries. *See Abbott*, 334 F.3d at 1354-55. The Federal Circuit rejected this practice of elevating extrinsic evidence above intrinsic evidence in *Phillips*. *See* 415 F.3d at 1320-24 (cautioning against the use of technical dictionaries as they may contradict the intrinsic evidence). In any event, Astellas does not ask the Court to adopt *any* of the three specific definitions in the patent and cannot point to any extrinsic (i.e., technical dictionaries) evidence supporting the use of a different definition than ones set forth explicitly by the patentees. (Tr. (Little) at 182:9-183:13.)

Astellas attempts to avoid the three specific definitions by arguing they relate to "*other embodiments*" in the patent. (D.I. 141 at 2-3.) That argument simply makes no sense—the definitions relate to an "immediate release formulation" "as used herein," and the only "inventions" disclosed in the patent are sustained release mirabegron formulations and their methods of use. (*See generally* Ex. 1; *id.* at 7:25-49; s*ee also Exeltis USA, Inc. v. Lupin Ltd.*, No. 22-434-RGA, 2023 WL 2306736, at *5 (D. Del. Mar. 1, 2023) (the use of quotation marks to identify a term followed by the phrase "as used herein" indicates the patentees have acted as their own lexicographers to define a term).)

**3. Astellas's proposed construction, which the experts agree would cover any immediate release formulation, does not provide any greater clarity in evaluating the scope of the Asserted Claims.** (Tr. (Little) at 181:22-182:8, (Savic) at 228:6-23; D.I. 124 at ¶¶ 85-88; D.I. 121 at ¶¶ 230, 232, 262.) Opening the claim to an infinite number of comparators (in terms of

4

composition and dosage amount) only results in each immediate release formulation comparing differently to every potential sustained release formulation. (Tr. (Chambliss) at 286:1-288:2; DDX3-18; D.I. 121 at ¶ 263-65.) As a result, a POSA might determine a formulation to be infringing based on one set of the infinite hypothetical comparators and noninfringing based on another set. Dr. Chambliss's unrebutted testimony explained that two of Astellas's clinical studies, 178-CL-001 (capsules) and 178-CL-030 (tablets), demonstrated that changes in the immediate release formulation can dramatically alter the results and any comparison to a sustained release formulation in evaluating infringement. (Tr. (Chambliss) at 288:11-290:5; DDX3-19.) Therefore, the claims are invalid as indefinite. *See Dow Chem. Co.*, 803 F.3d at 634.

Comparative Example 1 does not fix Astellas's faulty construction. (Tr. (Little) at 186:1-190:8; D.I. 141 at 7-8.) Dr. Little appeared to limit the immediate release comparator to those with the same performance as Comparative Example 1 in the patent, but the patent does not contain *in vitro* dissolution or *in vivo* clinical test results establishing the characteristics of Comparative Example 1 nor explain whether it meets any of the three definitions or even Astellas's proposed construction. (Tr. (Little) at 191:14-192:3, 186:1-11, 186:22-187:10; D.I. 121 at ¶¶ 232-33.) Dr. Little provided no basis for comparing any other formulation to Comparative Example 1. (Tr. (Chambliss) at 282:1-283:7; DDX3-14; D.I. 121 at ¶¶ 233-39 (a POSA would not know based on the patent how to compare other immediate release formulations to Comparative Example 1).)

Astellas's reliance on *Liberty Ammunition, Inc. v. United States*, 835 F.3d 1388 (Fed. Cir. 2016) to limit the immediate release comparator to Comparative Example 1 fares no better. (Tr. (Astellas Op.) at 33:1-34:24.) In *Liberty Ammunition*, the only reference to a conventional projectile comparator in the specification was to a specific bullet and a NATO standard to further define that bullet. 835 F.3d at 1396. In this case, the specification does not limit the immediate release comparator to the example, nor does it provide additional information to further elucidate the properties of Comparative Example 1.

### C. It is impossible for a POSA to determine whether a formulation "provides a continuous drug release for at least 4 hours after oral administration."

The experts agree that "continuous drug release for at least 4 hours after oral administration" refers to drug release *in vivo* and that no method exists to measure *in vivo* drug release. (Tr. (Astellas Op.) at 24:3-9, (Taft) at 145:1-9, (Savic) at 229:17-231:18, (Chambliss) at 293:13-294:6; D.I. 124 at ¶¶ 90-91; D.I. 121 at ¶¶ 249, 252, 279.) Having agreed to a construction that renders infringement impossible to prove, Astellas argues that a POSA would evaluate infringement based on surrogate approaches: *in vitro* dissolution and drug concentrations in blood plasma. (D.I. 141 at 8.) These methods do not accurately measure *in vivo* drug release. (Tr. (Chambliss) at 294:6-296:22; DDX3-21; D.I. 121 at ¶¶ 253-58, 277-78.) If this agreed construction leads to a claim that cannot be infringed, any failure rests with the patentees. *See Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) (a claim term should be construed with its only reasonable interpretation even if doing so leaves the claim invalid or nonsensical).

Astellas's citation to this Court's claim construction in Mirabegron I does not address the issue here. (D.I. 141 at 8.) That opinion adopted a proposed construction that would avoid indefiniteness because the construction found support in the intrinsic evidence. *See Astellas Pharma Inc. v. Actavis Elizabeth LLC*, No. 16-905-JFB-CJB, 2018 WL 4776372, at *18 (D. Del. June 18, 2018). Here, Astellas agreed to an indefinite construction and cannot now propose an alternative that would incorporate such surrogate measurements.

5

## II. Astellas cannot establish Defendants' ANDA products infringe the Asserted Claims.

### A. Astellas has offered no direct evidence of infringement.

Astellas does not dispute that it has never directly tested Defendants' ANDA products in healthy subjects, let alone patients with OAB. (Tr. (Astellas Op.) at 47:14-48:3, (Little) at 197:1-5; Ex. 145 at 29:10-30:5, 186:22-187:9.) Moreover, Astellas offers no evidence of testing *any product* containing 25 mg of mirabegron. (Tr. (Chambliss) at 297:1-298:13; D.I. 121 at ¶ 310.) The only testing of Defendants' products that Astellas relies on are *in vitro* dissolution studies and *in vivo* blood plasma levels from Defendants' bioequivalence studies. (Tr. (Little) at 164:9-167:7, (Taft) 122:21-125:1; D.I. 103 at ¶¶ 84-95; D.I. 144, Ex. A, ¶¶ 28-30.) These surrogate measurements do not establish how a drug is released in the human body. (Tr. (Savic) at 230:4-231:18, (Chambliss) at 298:14-299:19.) Taken together, this should end the infringement inquiry.

Astellas cannot overcome its lack of evidence by pointing to conclusory testimony that Defendants' ANDA products may be administered "with or without food." (D.I. 99 at 8-9; Tr. (Taft) at 102:12-21; D.I. 103 at ¶¶ 59-60.) Drs. Savic and Chambliss explained that this label instruction does not relate to whether the products demonstrate a food effect and certainly does not indicate that the products would have a "reduced" food effect in comparison to an undefined immediate release formulation. (Tr. (Savic) at 232:20-233:8, (Chambliss) at 299:23-300:11.) In fact, Astellas advised FDA that the phase III clinical studies that justified the label instruction were inadequate to evaluate any food effect. (DDX3-25; D.I. 121 at ¶¶ 303, 319; Ex. 4 at ASTMIRA_00466704.)

### B. Astellas's "probative evidence" is insufficient to establish a likelihood of success regarding infringement.

Lacking direct evidence, Astellas turns to what it calls "probative evidence"—prior testing of Myrbetriq and the false assumption that Defendants' products must behave the same way because they are bioequivalent to Myrbetriq.[6] (D.I. 141 at 4.) The key issues here are (1) Myrbetriq is not representative of Defendants' products, and (2) Astellas's R&D testing does not show that Myrbetriq has a "reduced food effect" or "continuous drug release."

**1. The experts agree that Myrbetriq, Zydus's ANDA product, and Lupin's ANDA product each have different compositions.** It is undisputed that composition affects drug release, drug absorption, and food effects. (Tr. (Little) at 188:2-20, (Chambliss) 274:16-275:19; D.I. 121 at ¶¶ 77-84.) In Mirabegron II, this Court held that evidence regarding products other than Defendants' ANDA's products would not be relevant to an infringement analysis unless Astellas could establish that the other products are "the same or essentially the same" as Lupin and Zydus's ANDA products. (*Astellas Pharma Inc. v. Sandoz, Inc.*, C.A. No. 20-1589-JFB-CJB, D.I. 504 at ¶ 4.) Astellas never made such a showing and instead points to bioequivalence between Defendants' respective ANDA products and Myrbetriq (D.I. 99 at 8-9), but it is well-settled that bioequivalence does not mean two products are the same. *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*,

---

[6] FDA did not determine that the 030 study showed a reduced food effect between Myrbetriq and an immediate release tablet, as Astellas argued. (Tr. (Astellas Op.) at 56:11-57:8; Ex. 148 at 57.) Nor could it. The 030 study did not test Myrbetriq, 25 mg or 50 mg, but rather three different 200 mg sustained release formulations and a 100 mg immediate release tablet. (Ex. 24 at ASTMIRA_00040601.) That study did not evaluate food effects compared to the immediate release tablet because the immediate release tablet was only administered in the fasted state. (*Id.*)

6

616 F.3d 1283, 1289 (Fed. Cir. 2010) (bioequivalence does not mean two products are similar with respect to pharmacokinetics); (Tr. (Savic) at 234:14-235:10; (Chambliss) at 297:1-16.)

**2. Even if Myrbetriq was representative of Defendants' ANDA products (it is not), Astellas has failed to prove Myrbetriq is within the scope of the Asserted Claims**. *See Adams*, 616 F.3d at 1289. Dr. Taft concedes that there is no data in the patent showing a reduced food effect for Myrbetriq. (Tr. (Taft) at 147:10-17.) Dr. Taft attempts to fill this gap by comparing different studies cherry-picked from a larger group of Astellas food effect studies. (Tr. (Taft) at 130:24-132:14, 136:2-11.) This type of "cross-study" comparison is flawed. (Tr. (Savic) at 231:19-232:19, 238:21-239:16, 244:9-245:3, (Chambliss) at 298:14-299:19; DDX3-24.)

Dr. Taft's post-hoc justifications for excluding all but two studies (that they did not follow the FDA Guidance) are not credible. (Tr. (Taft) at 133:10-134:21, 144:20-24.) None of the Myrbetriq studies, including those that Dr. Taft relied upon, administered the same meal composition or complied with the FDA Guidance recommendations on meal content (1000 kcal and 50% fat) and timing. (Tr. (Taft) at 136:19-140:22 (001 and 030 studies did not comply with FDA Guidance), (Savic) at 238:21-239:16; Ex. 15 at DEFS-MIRAII-000867-69; Ex. 162, 041 study at ASTMIRA_00040784 (1025 kcal, 60% fat content); Ex. 164, 064 study at ASTMIRA_00043465 (900 kcal, 35% fat content); Ex. 165, 078 study at ASTMIRA_00044122 (960 kcal, 47% fat content).) The experts agreed that differences in meal composition and timing preclude comparison between different studies to evaluate differences in food effect. (D.I. 144, Ex. B, ¶ 16; Tr. (Taft) at 142:19-143:1, 144:12-19, (Savic) at 238:21-239:16.) Dr. Taft's analysis should be disregarded.

Astellas's infringement theory collapses when accounting for the excluded studies. (Tr. (Savic) at 245:4-246:11.) If all studies are examined together, a POSA would be unable to conclude whether there were differences in food effect between the immediate release capsules and Myrbetriq 50 mg using either Dr. Taft's method (geometric mean ratio) or the Example 10 method (rate of decrease). (Tr. (Savic) at 235:11-244:8.) The food effects seen in the various studies testing Myrbetriq demonstrate results that cannot be distinguished from food effect studies testing immediate release capsules. (DDX2-32-34; Tr. (Savic) at 235:11-241:5; D.I. 124 at ¶¶ 107-11, Table 1 (illustrating overlap of mean values and variability precluding statistical differentiation of all mirabegron food effect studies identified by Astellas).) Because the values under either approach are so similar, a POSA cannot determine any difference between the study results, let alone differences due to the formulations tested. (DDX2-32-37; Tr. (Savic) at 235:11-244:8; D.I. 124 at ¶¶ 107-18, Tables 1-4.) Thus, the evidence does not show that Myrbetriq satisfies the Asserted Claims. (Tr. (Savic) at 245:4-246:11; D.I. 124 at ¶ 119.) Even if Myrbetriq were representative of Defendants' products (it is not), it would not establish infringement. *Zenith Lab'ys. Inc, v. Bristol-Myers Squibb Co.*, 19 F.3d 1418, 1423 (Fed. Cir. 1994) ("[I]t is error for a court to compare in its infringement analysis the accused product or process with the patentee's commercial embodiment or other version of the product or process; the only proper comparison is with the claims of the patent.").

Dated: March 27, 2024

| | |
|---|---|
| YOUNG CONAWAY STARGATT & TAYLOR, LLP | PHILLIPS, MCLAUGHLIN & HALL, P.A. |

/s/ *Pilar G. Kraman*  
Pilar G. Kraman (No. 5199)  
Alexis N. Stombaugh (No. 6702)  
Jennifer P. Siew (No. 7114)  
Rodney Square  
1000 North King Street  
Wilmington, DE 19801  
(302) 571-6600  
pkraman@ycst.com  
astombaugh@ycst.com  
jsiew@ycst.com  

*Of Counsel:*

Michael J. Gaertner  
David B. Abramowitz  
Carolyn A. Blessing  
Emily L. Savas  
Jonathan B. Turpin  
Leah M. Brackensick  
LOCKE LORD LLP  
111 South Wacker Drive  
Chicago, IL 60606  
(312) 443-0700  
mgaertner@lockelord.com  
dabramowitz@lockelord.com  
cblessing@lockelord.com  
esavas@lockelord.com  
jonathan.turpin@lockelord.com  
leah.brackensick@lockelord.com  

*Attorneys for Zydus Pharmaceuticals (USA) Inc. and Zydus Lifesciences Limited*

/s/ *John C. Phillips, Jr.*  
John C. Phillips, Jr. (#110)  
Megan C. Haney (#5016)  
1200 N. Broom St  
Wilmington, DE 19806  
(302) 655-4200  
jcp@pmhdelaw.com  
mch@pmhdelaw.com  

*Of Counsel:*

William R. Zimmerman  
Andrea Cheek  
Matthew S. Friedrichs  
KNOBBE, MARTENS, OLSON & BEAR, LLP  
1717 Pennsylvania Ave. N.W., Ste. 900  
Washington D.C. 20006  
Tel: (202) 640-6400  
Fax: (202) 640-6401  
Bill.Zimmerman@knobbe.com  
Andrea.Cheek@knobbe.com  
Matthew.friedrichs@knobbe.com  

Carol Pitzel Cruz  
KNOBBE, MARTENS, OLSON & BEAR, LLP  
925 Fourth Avenue, Suite 2500  
Seattle, WA 98104  
Tel: (206) 405-2000  
Fax: (206) 405-2001  
Carol.Pitzel.Cruz@knobbe.com  

*Attorneys for Lupin Ltd. and Lupin Pharmaceuticals, Inc.*