**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ASTELLAS PHARMA INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 23-819-JFB-CJB |
| | ) | |
| LUPIN LTD., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

<u>**REPORT AND RECOMMENDATION**</u>

In this Hatch-Waxman patent action filed by Plaintiffs Astellas Pharma Inc. ("API"), Astellas Ireland Co., Ltd. ("AICL") and Astellas Pharma Global Development, Inc. ("APGD" and collectively with API and AICL, "Astellas" or "Plaintiffs") against Defendants Lupin Ltd., Lupin Pharmaceuticals, Inc. (together, "Lupin"), Zydus Pharmaceuticals (USA) Inc. and Zydus Lifesciences Limited (together, "Zydus" and collectively with Lupin, "Defendants"), presently pending before the Court is Plaintiffs' motion for preliminary injunction (the "Motion"), (D.I. 98), filed pursuant to Federal Rule of Civil Procedure 65. With the Motion, Plaintiffs seek to enjoin Defendants from making, using, offering to sell, or selling in the United States, or importing into the United States, Defendants' mirabegron ANDA products, because those products allegedly infringe the claims of United States Patent No. 11,707,451 (the "'451 patent"). (*Id.*; *see also* D.I. 99 at 1) For the reasons set forth below, the Court recommends that the Motion be DENIED.

# I. BACKGROUND

## A. Factual Background

### 1. Overactive Bladder Treatment Generally

Overactive bladder ("OAB") is a syndrome that impacts an individual's urinary frequency and urgency. (D.I. 1, ex. A; D.I. 102 ("Nitti Decl.") at ¶ 21; D.I. 105 ("Vellturo Decl.") at ¶ 18) OAB affects millions of people in the United States and can have serious impacts on a person's quality of life. (Vellturo Decl. at ¶ 19; *see also* D.I. 99 at 1) Drugs to treat OAB have been around for years, but these drugs belonged to a class of compounds known as antimuscarinics, which exhibited undesirable side effects, such as dry mouth, constipation, drowsiness and blurred vision. (Nitti Decl. at ¶ 32) These side effects resulted in high levels of patient noncompliance with treatment and discontinuation of that treatment. (*Id*.) With their Myrbetriq® sustained-release tablets ("Myrbetriq"), Plaintiffs sought to produce a treatment for OAB with decreased side effects. (*Id*. at ¶¶ 34-36)

### 2. Plaintiffs and Their Myrbetriq® Products

Astellas is an international pharmaceutical company that concentrates on developing innovative treatments. (D.I. 1 at ¶¶ 1-3; Vellturo Decl. at ¶ 15; D.I. 122 ("Hofmann Decl.") at ¶ 21) AICL and APGD are subsidiaries of API. (D.I. 1 at ¶¶ 2-3) APGD holds approved New Drug Application ("NDA") No. 202611 for Myrbetriq, which was approved by the United States Food and Drug Administration ("FDA") on June 28, 2012. (*Id*. at ¶ 22) Myrbetriq is indicated for the treatment of OAB; it contains the active compound mirabegron and is available in two strengths: 25 mg and 50 mg. (*Id*. at ¶¶ 23, 26)

Myrbetriq is a sustained release formulation (sometimes also referred to as an "extended release" formulation). A sustained release formulation is generally understood to be a formulation that slowly releases the drug into a patient's gastrointestinal tract, where it will then be absorbed from the intestine into the patient's blood stream. (D.I. 103 ("Taft Decl.") at ¶ 46;

D.I. 121 ("Chambliss Decl.") at ¶ 67)  Myrbetriq is alleged to be covered by one or more claims of the '451 patent (the "patent-in-suit" or the "Asserted Patent").  (D.I. 1 at ¶ 37)

### 3.    The Asserted Patent

API is the record owner and assignee of the '451 patent.  (*Id*. at ¶ 31)  The '451 patent issued on July 25, 2023 and is entitled "Pharmaceutical Composition for Modified Release[;]" it contains six claims.  ('451 patent at 1; *id*., cols. 44:64-46:18)  The patent generally claims a method for treating OAB, such that the treating is with a reduced food effect, comprising administering orally a tablet comprising 10 mg to 200 mg mirabegron in a sustained release formulation that provides a continuous drug release for at least 4 hours after oral administration, wherein the sustained release formulation further comprises a carrier, and wherein the reduced food effect is compared to that after oral administration of an immediate release formulation of mirabegron.  ('451 patent; D.I. 1 at ¶ 30)  The '451 patent is listed in the FDA's Orange Book as covering Myrbetriq.  (D.I. 101, ex. 72; D.I. 1 at ¶ 38)

AICL is the exclusive licensee of the '451 patent.  (D.I. 1 at ¶ 34)  APGD has contracted with AICL to clinically develop mirabegron, prepare and submit NDA No. 202611 for marketing approval of Myrbetriq in the United States.  (*Id*. at ¶ 35)  AICL has contracted with Astellas Pharma US, Inc., a subsidiary of API, to market and sell Myrbetriq in the United States on its behalf.  (*Id*. at ¶ 36)

Plaintiffs allege that Defendants infringe at least claims 4, 5 and 6 (the "Asserted Claims") of the '451 patent, which all depend from claim 1.  (D.I. 99 at 1)  Claim 5 also depends from claim 2, and claim 6 also depends from claim 3.  All of these claims include a "reduced food effect" limitation, which, as the Court will discuss extensively below, will be key to the

resolution of this Motion. Below the Court will reproduce the content of the Asserted Claims

(and those claims they depend on), with that key claim limitation in italics.

Claim 1 of the '451 patent recites:

> **1.** A method for treating overactive bladder such that the treating is with a *reduced food effect*, the method comprising administering orally to a subject in need thereof a tablet comprising 10 mg to 200 mg of (R)-2-(2-aminothiazol-4-yl)-4´-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide [("mirabegron")][1] in a sustained release formulation,
>
> wherein the sustained release formulation further comprises a carrier and provides a continuous drug release for at least 4 hours after oral administration,
>
> wherein the sustained release formulation is any one selected from the group consisting of a sustained release hydrogel-forming formulation, a multi-layered formulation consisting of a drug core and a release-controlling layer which are geometrically arranged, a gel formulation in which a plurality of gums are combined, an osmotic pump type formulation[,] a formulation utilizing a swelling polymer, a matrix formulation utilizing a water-soluble polymer, a modified release formulation with a coating membrane, and a matrix formulation utilizing an insoluble polymer, and
>
> wherein the *reduced food effect* is compared to that after oral administration of an immediate release formulation comprising [mirabegron].

('451 patent, cols. 44:64-46:3 (emphasis added)) Claim 2 of the '451 patent recites:

> **2.** The method according to claim **1**, wherein the tablet comprises 25 mg of [mirabegron].

(*Id*., col. 46:4-6) Claim 3 of the '451 patent recites:

> **3.** The method according to claim **1**, wherein the tablet comprises 50 mg of [mirabegron].

(*Id*., col. 46:7-9) Claim 4 of the '451 patent recites:

---

[1]     It is undisputed that (R)-2-(2-aminothiazol-4-yl)-4´-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide is mirabegron. (D.I. 99, ex. A at i n.1)

4

          **4.** The method according to claim **1**, wherein the sustained release formulation is a sustained release hydrogel-forming formulation.

(*Id*., col. 46:10-12) Claim 5 of the '451 patent recites:

          **5.** The method according to claim **2**, wherein the sustained release formulation is a sustained release hydrogel-forming formulation.

(*Id*., col. 46:13-15) Claim 6 of the '451 patent recites:

          **6.** The method according to claim **3**, wherein the sustained release formulation is a sustained release hydrogel-forming formulation.

(*Id*., col. 46:16-18)

### 4.       Defendants

Lupin and Zydus are international pharmaceutical companies focused on generic formulations. (D.I. 1 at ¶¶ 4-7, 10-13; Vellturo Decl. at ¶¶ 16-17; Hofmann Decl. at ¶¶ 22-23)

As of August 25, 2016, Lupin submitted to the FDA ANDA No. 209485 for mirabegron extended release tablets, 25 mg and 50 mg, which is a generic version of Myrbetriq; therein, Lupin sought authorization to commercially manufacture, use, import, offer to sell, or sell Lupin's ANDA products in the United States. (D.I. 1 at ¶ 44) On September 28, 2022, Lupin received final approval from the FDA for Lupin's ANDA products. (*Id*. at ¶ 50)

As of September 6, 2016, Defendant Zydus submitted to the FDA ANDA No. 209488 for mirabegron extended release tablets, 25 mg and 50 mg, which is a generic version of Myrbetriq, seeking authorization to commercially manufacture, use, import, offer to sell, or sell Zydus' ANDA products (together with Lupin's ANDA products, "Defendants' ANDA products") in the United States. (*Id*. at ¶ 79) On September 29, 2022, Zydus received final approval from the FDA for Zydus' ANDA products. (D.I. 20 at ¶ 85)

Additional facts relevant to resolution of the instant Motion will be discussed in Section III.

## B.    Procedural Background

This is the third patent infringement action brought by Plaintiffs in our Court against Defendants involving Defendants' ANDAs for mirabegron sustained-release tablets.[2]  The first action, Civil Action No. 16-905-JFB-CJB, was filed on October 6, 2016 and was resolved via settlement and license agreements.  (Civil Action No. 16-905-JFB-CJB, D.I. 536; D.I. 582)  The second action, Civil Action No. 20-1589-JFB-CJB, which was filed on November 24, 2020, is currently on appeal to the United States Court of Appeals for the Federal Circuit, after the District Judge invalidated asserted United States Patent No. 10,842,780 for failure to comply with 35 U.S.C. § 101.  (Civil Action No. 20-1589-JFB-CJB, D.I. 571, D.I. 574)  In light of the manner in which these two litigations resolved, Defendants were and are preparing to launch their ANDA products in 2024.  (D.I. 39 at 18-21; D.I. 77 at 1; D.I. 79 at 1; D.I. 198 at 15)

Plaintiffs then commenced the third action—the instant action—on July 28, 2023.  (D.I. 1)  In light of the procedural posture of this case and the prior two litigations, the parties were aware at the outset of the case of the potential need to plan for preliminary injunction proceedings.  After discussing that issue with the parties, (*see* D.I. 83), on January 22, 2024, the Court issued a Scheduling Order regarding such proceedings, (D.I. 94).  Pursuant to that order, on January 26, 2024, Plaintiffs filed the instant Motion.  (D.I. 98)  Initial pre-hearing briefing on the Motion, which included the submission of a voluminous record, (*see* D.I. 100-07, 121-26, 142, 144, 151-52, 158), was completed on March 6, 2024, (D.I. 141).  The Court held an

---

[2]    All three of these civil actions, including the instant case, were or are assigned to visiting United States District Judge Joseph F. Bataillon, and were or are referred to the Court for various pre-trial purposes.  With regard to the instant case, Judge Bataillon has referred the case to the Court for resolution of the instant Motion, to issue scheduling orders, to resolve all non-dispositive motions (except for *Daubert* motions, *Markman* hearings and motions *in limine*) including discovery matters, and to handle the pre-trial conference.  (D.I. 186; D.I. 194)

evidentiary hearing and heard oral argument on the Motion at a preliminary injunction hearing on March 19, 2024 (the "March 19 hearing"). (D.I. 198 (hereinafter, "Tr.")) Thereafter, at the Court's request, the parties filed supplemental post-hearing briefing on March 27, 2024. (D.I. 188; D.I. 189)[3] At the preliminary injunction hearing, the Court advised the parties it would issue a Report and Recommendation on the Motion by no later than April 19, 2024. (Tr. at 390, 392)

## II. STANDARD OF REVIEW

"[A] preliminary injunction is a drastic and extraordinary remedy that is not to be routinely granted." *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993) (citations omitted); *accord Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right."). However, the Patent Act does provide that injunctions "may" issue "in accordance with the principles of equity[.]" 35 U.S.C. § 283.

---

[3]     In connection with the Motion, Plaintiffs also filed a Motion for Leave to File Reply Declarations of David R. Taft, Ph.D. and Steven R. Little, Ph.D. ("Motion for Leave"). (D.I. 143) Defendants oppose the Motion for Leave. In the Motion for Leave, Plaintiffs argue that the proffered reply declarations of their experts Dr. Taft and Dr. Little are necessary to provide Plaintiffs with a meaningful opportunity to respond to certain of Defendants' allegedly belatedly-provided invalidity and infringement arguments. (*Id*. at 3-9) Although the reasons Plaintiffs cite as necessitating the submission of these reply reports do not directly address the definiteness issue that is discussed in this opinion, the Court will simply GRANT the Motion for Leave. That is because, even taking into account the content of the proffered reply reports, the Court still concludes that Plaintiffs cannot prevail on their Motion.

Additionally, during the March 19 hearing, (Tr. at 8-9), and in a letter filed with the Court on March 28, 2024, (D.I. 190), Defendants raised objections to Plaintiffs' lodging of, and citation to (in Plaintiffs' supplemental brief), certain deposition transcripts that were filed after the completion of initial briefing on the Motion. (*See* D.I. 151; D.I. 152) Plaintiffs filed a response to these objections on April 1, 2024. (D.I. 191) Here the Court will DENY Defendants' objections as MOOT, in that even taking into account this additional record, the Court has determined that Plaintiffs' Motion cannot succeed.

A movant for a preliminary injunction pursuant to 35 U.S.C. § 283 must establish: "(1) a reasonable likelihood of success on the merits; (2) irreparable harm if an injunction is not granted; (3) a balance of hardships tipping in its favor; and (4) the injunction's favorable impact on the public interest." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001) (citation omitted). No one of these factors is dispositive; "rather, the district court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested." *Id.* (quoting *Hybritech, Inc. v. Abbott Lab'ys*, 849 F.2d 1446, 1451 (Fed. Cir. 1988)) (internal quotation marks omitted). However, "a movant cannot be granted a preliminary injunction unless it establishes *both* of the first two factors, *i.e.*, likelihood of success on the merits and irreparable harm." *Id.* (emphasis in original) (citations omitted). Moreover, "[w]hile granting a preliminary injunction requires analysis of all four factors, [] a trial court may . . . deny a motion based on a patentee's failure to show any one of the four factors—especially either of the first two—without analyzing the others[.]" *Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1356 (Fed. Cir. 2002) (citations omitted); *see also Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.*, 908 F.2d 951, 953 (Fed. Cir. 1990).

## III. DISCUSSION

In opposing the Motion, Defendants made various arguments as to why Plaintiffs could not make a sufficient showing as to the first factor: i.e., that Plaintiffs had a reasonable likelihood of success on the merits. (D.I. 120 at 9-17) Defendants also argued that Plaintiffs could not sufficiently demonstrate irreparable harm, (*id.* at 17-20), and that the other two preliminary injunction factors went their way, (*id.* at 20). For reasons the Court will further explain below, in this Report and Recommendation the Court will conclude that Plaintiffs have not met their burden to satisfy the "reasonable likelihood of success" factor. In light of this, the

Court need not address the remaining preliminary injunction factors and will recommend that the Motion be denied. *See, e.g., Chestnut Hill Sound Inc. v. Apple Inc.*, Civil Action No. 15-261-RGA, 2015 WL 6870037, at *2 (D. Del. Nov. 6, 2015); *Elf Atochem N. Am., Inc. v. LaRoche Indus., Inc.*, 85 F. Supp. 2d 336, 349 (D. Del. 2000).

To demonstrate a likelihood of success on the merits, the movant must show, in light of the presumptions and burdens that will inhere at trial on the merits, that it will likely prove infringement, and that it will likely withstand an accused infringer's challenges to the validity and enforceability of the patent. *Sciele Pharma Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1259 (Fed. Cir. 2012). As will be discussed further below, while Defendants raise a number of challenges relevant to this factor, herein the Court need only address one of their validity challenges relating to the issue of definiteness. *See, e.g., Waters Corp. v. Agilent Techs. Inc.*, 410 F. Supp. 3d 702, 713 n.11 (D. Del. 2019) ("Having found that Plaintiffs have not established a likelihood of success as to validity, . . . the Court does not address the other validity challenges raised by Defendant.").

Below, the Court will first set out the legal standards regarding patent definiteness and how they relate to this preliminary injunction inquiry. Thereafter, the Court will discuss the parties' arguments as to the "reduced food effect" limitation, explaining why they result in the Court's recommendation that the Motion be denied.

### A. Legal Standards Regarding Definiteness and Interplay with the Preliminary Injunction Standard

Under 35 U.S.C. § 112 ("Section 112"), the claims of a patent, when "viewed in light of the specification and prosecution history, [must] inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). "The definiteness requirement . . . mandates clarity, while recognizing that absolute

precision is unattainable." *Id.* Generally, the party asserting invalidity has the burden of establishing that defense by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011).

In order for Defendants to successfully oppose a preliminary injunction on indefiniteness grounds here, however, they "need not prove actual invalidity." *Erico Int'l Corp. v. Vutec Corp.*, 516 F.3d 1350, 1356 (Fed. Cir. 2008). Instead, they need only to "put forth a substantial question of invalidity to show that the claims at issue are vulnerable." *Id.*; *see also Amazon.com*, 239 F.3d at 1358-59 ("Vulnerability is the issue at the preliminary injunction stage, while validity is the issue at trial."); *Bayer Intell. Prop. GmbH v. CAP IM Supply, Inc.*, Civil Action No. 17-cv-591-RGA, 2018 WL 1517688, at *8 (D. Del. Mar. 28, 2018). In this sense, "a showing of a substantial question of invalidity requires less proof than the clear and convincing standard to show actual invalidity." *Erico Int'l Corp.*, 516 F.3d at 1356; *see also Amazon.com*, 239 F.3d at 1358-59. "[T]he trial court does not resolve the validity question but rather must . . . make an assessment of the persuasiveness of the challenger's evidence,[] recognizing that it is doing so without all evidence that may come out at trial." *New England Braiding Co. v. A.W. Chesterton Co.*, 970 F.2d 878, 883 (Fed. Cir. 1992); *see also Amazon.com*, 239 F.3d at 1358-59.

"[T]he patent enjoys the same presumption of validity during preliminary injunction proceedings as at other stages of litigation." *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1377 (Fed. Cir. 2009) (citation omitted). When the accused infringer, as here, launches an attack on the validity of the patent (such as through an indefiniteness challenge), the initial burden is on the challenger to come forward with evidence of invalidity in the first instance. *Id.* Then the patentee, in order to avoid a conclusion that it is unable to show a likelihood of success, has the burden of responding with contrary evidence. *Id.* In other words,

once the challenger presents initially persuasive evidence of invalidity, the burden going forward shifts to the patentee to present contrary evidence and argument. In attempting to meet that burden, Plaintiffs do not have to "establish the validity of [the] patent beyond question." *Amazon.com*, 239 F.3d at 1359 (citation omitted). That said, they must "present a clear case supporting the validity of" that patent, *id.*, in that they must show that the alleged infringer's defense lacks substantial merit, *see Titan Tire Corp.*, 566 F.3d at 1377.

**B.    Discussion**

As noted above, of the many arguments Defendants make as to why Plaintiffs are not reasonably likely to succeed on the merits, the one the Court will discuss herein is that the '451 patent is not likely to withstand a validity challenge on the ground that the Asserted Claims are indefinite under Section 112. (D.I. 120 at 9-14; D.I. 189 at 1-5) Below, the Court will explain why Defendants' indefiniteness challenge raises a substantial question as to whether the Asserted Claims of the '451 patent are valid.[4]

Defendants argue that the Asserted Claims are indefinite in light of the presence of a number of different claim limitations found in the Asserted Claims. Herein, the Court will focus only on Defendants' arguments as to one of those: the "reduced food effect" limitation. As was noted above, "reduced food effect" appears both in the preamble and in the third "wherein" clause of claim 1. ('451 patent, col. 44:65; *id.*, col. 45:17)

---

[4]       In light of this conclusion, the Court will not address Defendants' invalidity challenge regarding obviousness, (D.I. 120 at 14-17), nor its argument that Plaintiffs are not likely to succeed in proving infringement of the Asserted Patent, (*id.* at 4-9; D.I. 189 at 6-7).

The term "reduced food effect" includes the two-word phrase "food effect"—and both Plaintiffs' and Defendants' experts[5] generally agree at least as to what *that* phrase means. "Food effect" refers to differences in the absorption of a drug when it is taken with food as opposed to on an empty stomach. (*See* Taft Decl. at ¶¶ 24-25; D.I. 124 ("Savic Decl.") at ¶¶ 33-35; Tr. at 95, 102, 212-13, 246-47; D.I. 189 at 1 n.2) The effectiveness of a drug can be impacted by whether or a not a patient has eaten prior to taking the drug. (Taft Decl. at ¶ 25)

The definiteness dispute here, then, is over the claims' addition of the word "reduced" to this term. "Reduced" is a term of degree, and while "terms of degree are not inherently indefinite" they "will fail for indefiniteness unless they provide objective boundaries for those of skill in the art when read in light of the specification and the prosecution history." *Liberty Ammunition, Inc. v. United States*, 835 F.3d 1388, 1396 (Fed. Cir. 2016) (internal quotation marks and citations omitted). In other words, in the definiteness context, "[t]erms of degree are problematic if their baseline is unclear to those of ordinary skill in the art." *Id*. at 1395.

---

[5]     The Court heard testimony at the March 19 hearing from four experts regarding definiteness (and other issues), all of whom are accomplished in their fields. Plaintiffs' testifying experts, whom the Court previously mentioned above, were Dr. Taft and Dr. Little. Dr. Taft is a Professor of Pharmaceutics and Chair of the Division of Pharmaceutical Sciences in the Arnold & Marie Schwartz College of Pharmacy and Health Sciences at Long Island University. (Taft Decl. at ¶ 3) Dr. Little is the Chair of the Department of Chemical Engineering and the William Kepler Whiteford Endowed Professor of Chemical Engineering, Bioengineering, Pharmaceutical Sciences, Immunology, Ophthalmology and the McGowan Institute for Regenerative Medicine at the University of Pittsburgh. (D.I. 104 at ¶ 3) Defendants' testifying experts were Walter Chambliss, Ph.D. and Radojka Savic, Ph.D. Dr. Chambliss is the Professor Emeritus and Research Professor Emeritus of Pharmaceutics and Drug Delivery at the University of Mississippi. (Chambliss Decl. at ¶ 10) Dr. Savic is a Professor of Bioengineering & Therapeutic Sciences in the School of Pharmacy at the University of California, San Francisco ("UCSF") and a Professor of Pulmonary and Critical Care in the Department of Medicine at UCSF. (D.I. 124 at ¶ 11)

Defendants assert that "reduced food effect" is one of those unduly problematic terms of degree. They argue that this is so because there is no generally accepted definition for the term in the art, and a person of ordinary skill in the art (hereinafter, a "POSITA")[6] would not readily understand the term's meaning. (Savic Decl. at ¶ 67; Chambliss Decl. at ¶ 240; Tr. at 215-16, 283-84) And they claim that as a term of degree, "reduced food effect" promotes too much ambiguity as to the bounds of the claims. *See Liberty Ammunition*, 835 F.3d at 1396 (explaining "that the term 'reduced area of contact' is one of degree, as it necessarily calls for a comparison against some baseline"); *CA, Inc. v. Netflix, Inc.*, Case No. 2:21-CV-00080-JRG-RSP, 2021 WL 5323413, at *13-17 (E.D. Tex. Nov. 16, 2021) (finding claims with the terms "minimize[es/ing]" and "maximizing" indefinite "for failing to inform, with reasonable certainty, those skilled in the art about the scope of the invention" and agreeing with the defendant that "even if the Court were to adopt Plaintiff's construction that 'minimiz[es/ing]' means 'reduce' . . . [,] a person of ordinary skill in the art would not be able to identify any standard or baseline against which to compare a "reduc[tion]"); *see also* (D.I. 120 at 9). Essentially, Defendants are arguing that a POSITA would ask: How does a POSITA determine whether a food effect is "reduced"? and How would a POSITA know how much "reduction" is enough? Defendants say that a POSITA would not be able to discern these answers with reasonable certainty from the intrinsic record.

In further staking out their indefiniteness position here, Defendants take three main tacks. First, they argue that there is no clear definition of "reduced food effect" in the '451 patent, and

---

[6] The parties essentially agree on the definition of a POSITA as relevant to this Motion. (Tr. at 19-20, 82; Taft Decl. at ¶ 15; Chambliss Decl. at ¶ 21) While the parties' definitions of a POSITA differ slightly, at the March 19 hearing, both sides explained that their experts had testified that regardless of which definition of POSITA is used, the experts' opinions would not change. (Tr. at 19-20, 82, 99, 273) Thus, any differences between the definitions are immaterial for our purposes here. (*Id.*)

13

that, in fact, the patent includes multiple, conflicting alternative definitions of the term or of similar terms. ('451 patent, cols. 7:57-8:38; D.I. 120 at 10-11; D.I. 189 at 2) Second, they assert that Plaintiffs' proposed constructions for "reduced food effect" provide no help, in that those proposals fail to bring sufficient clarity to the term's meaning. (D.I. 189 at 3-4) And third, Defendants claim that the sole example in the patent to which a POSITA might look in order to understand the meaning of "reduced food effect"—Example 10—does not provide enough information to allow sufficient understanding of the meaning or the bounds of the term. (*Id*. at 2-3; D.I. 120 at 11-12) Below, the Court will address each of these arguments. In doing so, it will explain why, in its view, all of them contribute to the conclusion that there is a substantial question of indefiniteness here (and that the claims are thus vulnerable to an invalidity challenge on this ground).

### 1.     Column 7 and Column 8's Proposed Definitions

Defendants first argue that "reduced food effect" is indefinite because the patent provides multiple alternative definitions for the term (or, at least, as to terms very similar to "reduced food effect")—and that these alternative definitions create confusion and ambiguity as to the meaning of "reduced food effect." The relevant excerpts come from columns 7 and 8 of the '451 patent. Column 7 provides:

> The wording "the effects by food are reduced" as used herein means, for example, a reduction by 10% or more, a reduction by 20% or more in another embodiment, and a reduction by 30% or more in still another embodiment, in comparison with Cmax of a conventional formulation. Alternatively, the term means, for example, a reduction of 10% or more with respect to the rates of decrease of Cmax and AUC in administration after food intake, in comparison with Cmax and AUC in administration in the fasted

state, a reduction of 20% or more in another embodiment, and a reduction of 30% or more in still another embodiment.[7]

('451 patent, col. 7:57-67)  Column 8 goes on to add:

> The term "formulation in which the effects by food are reduced" as used herein means a formulation in which the dissolution rate of the drug from the formulation is less than 85% after 30 minutes from the beginning [of] a dissolution test, which is carried out under the above conditions.  In another embodiment, it means a formulation in which the dissolution rate of the drug from the formulation is 75% or less after 1.5 hours from the beginning [of] a dissolution test.  In still another embodiment, it means a formulation in which the dissolution rate of the drug from the formulation is 75% or less after 1.5 hours and 75% to 100% after 7 hours from the beginning [of] a dissolution test.

> The term "formulation in which the effects by food are reduced" as used herein means a formulation in which the Cmax when administered in a fasted state is 400 ng/mL or less (corresponding to an increase in heart rate of 16 bpm or less).  In another embodiment, it means a formulation in which the Cmax when administered in a fasted state is 300 ng/mL or less (corresponding to an increase in heart rate of 13 bpm or less).  In still another embodiment, it means a formulation in which the Cmax when administered in a fasted state is 200 ng/mL or less (corresponding to an increase in heart rate of 11 bpm or less).  In still another embodiment, it means a formulation in which the Cmax when administered in a fasted state is 150 ng/mL or less (corresponding to an increase in heart rate of 9 bpm or less).

(*Id*., col. 8:25-38)  In addressing these portions of the specification, the Court will primarily focus on the patent's discussion of the term "the effects by food are reduced" in column 7.  It does so simply as a way of streamlining its analysis of the impact of this portion of column 7 and 8.

---

[7]     Cmax is the maximum concentration of a drug measured in blood plasma after taking the drug.  (Taft Decl. at ¶ 29; Tr. at 104)  AUC, or "area under the curve," is a measure of the overall systemic exposure of the body to the drug over a period of time.  (Taft Decl. at ¶ 29; Tr. at 104-05)  Cmax and AUC are pharmacokinetic ("PK") parameters that are observed in PK studies, such as food effect studies.  (Taft Decl. at ¶ 31)  With regard to measuring food effect, there may be differences in Cmax and AUC depending on whether the drug was taken with or without food—differences that can impact drug safety and efficacy.  (*Id*. at ¶ 32)

Among the many questions that the Court must confront here, the first is: Do these portions of the '451 patent actually mean to provide definitions of *any* term—such that they might be said to be an example of the patentee at least attempting to act as its own lexicographer? In the Court's view, it appears that in column 7, the patentee *was* trying to provide a definition for "the effects by food are reduced." For one thing, this portion of column 7 (titled "Description of Embodiments") begins by noting that "[t]he pharmaceutical composition for modified release *of the present invention* will be explained hereinafter." (*Id.*, col. 7:23-24 (emphasis added)) That sounds like the patentee is getting ready to explain what the *claimed invention* is all about. *See Mosaic Brands, Inc. v. Ridge Wallet LLC*, 55 F.4th 1354, 1361 (Fed. Cir. 2022) (noting that while the claims are not always limited to what a patent describes as the "present invention," there, statements regarding the "present invention" would be understood to refer to the claimed invention as a whole) (citing cases); *Rsch. Corp. Techs., Inc. v. Microsoft Corp.*, 627 F.3d 859, 872 (Fed. Cir. 2010) ("These references to 'the present invention' strongly suggest that the claimed invention is limited to a blue noise mask.").[8] Moreover, in the portion of column 7 that discusses the meaning of "the effects by food are reduced," the patent states: "The wording 'the effects by food are reduced' *as used herein means . . . .*" ('451 patent, col. 7:57-58 (emphasis added)) The Federal Circuit and our Court have explained that when a patent states that a term "as used herein means," this is a signal that the patentee is acting as his own lexicographer. *See Abbott Lab'ys v. Andrx Pharms., Inc.*, 473 F.3d 1196, 1210-11 (Fed. Cir. 2007) (explaining that where a patent used the phraseology "as used herein, means[,]" this

---

[8]    *See also Broadcom Corp. v. Sony Corp.*, Case No. SAVC 16-1052 JVS (JCGx), 2016 WL 9108913, at *6 (C.D. Cal. Oct. 5, 2016) (assuming that when the patent describes "the present invention[,]" it is referring to the claimed invention); *Reedhycalog UK, Ltd. v. Baker Hughes Oilfield Operations Inc.*, No. 6:06 CV 222, 2008 WL 2152268, at *3 n.2 (E.D. Tex. May 21, 2008) (same).

indicated that the patentee was "unambiguously provid[ing] definitions" of the words that preceded that phrase); *Exeltis USA, Inc. v. Lupin Ltd.*, Civil Action No. 22-434-RGA, 2023 WL 2306736, at \*5 (D. Del. Mar. 1, 2023) (noting that "[t]he 'as used herein' leading into the definition . . . indicates that the patentee became [its] own lexicographer") (certain internal quotation marks and citation omitted). Additionally, the Federal Circuit and our Court have noted that when a term is set off by quotation marks in the specification (as here), that is also a strong sign that what follows is meant to be a definition. *See Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1136 (Fed. Cir. 2007); *Exeltis USA, Inc.*, 2023 WL 2306736, at \*5. So, for all of these reasons, it appears that in column 7, the patentee was at least intending to provide definitions of the term "the effects by food are reduced."

From there, the Court must ask: Even if this portion of the patent is attempting to define "the effects by food are reduced," could such definitions have any relevance to the meaning of our (slightly different) claim term: "reduced food effect"? Plaintiffs say no, noting that "the effects by food are reduced" and "reduced food effect" are two separate sets of words. (D.I. 188 at 5; Tr. at 41-42; *see also* D.I. 120 at 10 (Defendants calling these "related terms")) And of course they are. But the Court does not necessarily agree that simply because this is so, that means that column 7's definitions of "the effects by food are reduced" cannot or would not impact a POSITA's understanding of the meaning of the "reduced food effect" term. After all, the wording of the two terms is strikingly similar. Indeed, in the context of a patent whose claimed sustained release formulation treatment must be "with a reduced food effect," it is hard to fathom what other concept column 7's reference to "the effects by food are reduced" could be

17

describing.[9]  Plaintiffs, for their part, argue that these descriptions of what "the effects by food are reduced" means are not relevant, because they relate to embodiments of the invention that were never claimed.  (Tr. at 44-45)  But as Defendants note, (D.I. 189 at 2), Plaintiffs provide no real support for this assertion.[10]  And as the Court noted above, this discussion comes in a part of the patent that is all about "the present invention."  In the Court's view, then, these statements about the meaning of "the effects by food are reduced" *were* intended to provide insight into what the related term "reduced food effect" means when that term is used in the patent claims. (Chambliss Decl. at ¶ 244 (Defendants' expert Dr. Chambliss indicating that a POSITA would look to the definitions of "the effects by food are reduced" to try to ascertain the meaning of "reduced food effect"); Savic Decl. at ¶ 67 (same))

So, the Court has now concluded that:  (1) column 7's discussion of "the effects by food are reduced" was an effort by the inventors to try to provide definitions of that term; and (2)

---

[9]     The patent uses the term "the effects by food are reduced" only one other time—in column 7, in the paragraph just before the paragraph in which the instant proposed definitions are provided.  ('451 patent, col. 7:53-56 (". . . and the drug release is controlled to the extent that the effects by food are reduced and/or to the extent that the Cmax can be controlled to the specific value or less even at a single dose per day."))  But it additionally uses the (also very similar) phrase "reduce the effects by food" a few more times in a section of the patent titled "Solution to Problem[.]"  (*Id*., col. 2:48-52 ("The present inventors considered from this result that a formulation capable of continuous drug release for 4 hours or more would be able to *reduce the effects by food*, because the drug release from the formulation would become the rate-limiting step for absorption.") (emphasis added); *see also id*., col. 2:53-57)  In considering all of this, it is very difficult to emerge with any other conclusion than the patentee was considering "reduced food effect," "the effects by food are reduced" and "reduce the effects by food" simply to be different ways of conveying the same concept—a concept very relevant to the claimed invention.

[10]     In his declaration, Plaintiffs' expert Dr. Taft baldly states that these "statements from the patent specification [] relate to certain aspects of certain embodiments of other inventions in the patent."  (Taft Decl. at ¶ 132)  But he provides no further explanation on this point, including no discussion of what other invention (other than the claimed invention) this part of column 7 could have been referring to.

those proposed definitions were also meant to be relevant to the meaning of "reduced food effect." This then brings us to an additional question: Did the inventors *actually succeed* in their efforts to be lexicographers, such that they in fact clearly defined "reduced food effect" in column 7? Here, despite all it has said above, the Court is not so sure they did.

On this question, Plaintiffs point to the Federal Circuit's decision in *Abbott Lab'ys v. Syntron Bioresearch, Inc.*, 334 F.3d 1343 (Fed. Cir. 2003). They argue that *Abbott* teaches that if a patent provides alternate definitions for a term, and if those alternate definitions potentially conflict and could render the term's meaning unclear to a POSITA, then this means that the patentee has not successfully engaged in lexicography, such that the POSITA may look elsewhere to understand the term's meaning. (D.I. 141 at 3; D.I. 188 at 5; Tr. at 31-32) In *Abbott*, one of the claim terms at issue—"analyte"—was construed by the district court to mean "the substance of interest, i.e., the substance that the test is designed to detect if present in the liquid being tested." 334 F.3d at 1354 (emphasis omitted). This construction was in accordance with the plain and ordinary meaning of "analyte" as understood in technical dictionaries in specific fields of technology relevant to the invention. *Id*. On appeal, the defendant argued that "analyte" was indefinite because in one paragraph of the specification (one beginning "As used herein, 'analyte' refers [to] . . ."), the patentee set out two conflicting definitions for the term— one that gibed with the district court's construction and one that did not. *Id*. at 1354-55. The Federal Circuit disagreed. It noted that for a patentee to successfully be his own lexicographer as to a term, the definition must "appear *with reasonable clarity, deliberateness, and precision* before it can affect the claim." *Id*. at 1354 (internal quotation marks and citation omitted) (emphasis in original). It explained that because the key paragraph in the specification provided two different, alternative definitions for "analyte" that were not in harmony, the specification did

not provide "reasonable clarity, deliberateness, and precision" so as to amount to lexicography. *Id*. at 1355. In the end, the Federal Circuit concluded that the district court's construction of "analyte" was the term's plain and ordinary meaning—not only because it aligned with the way that the technical dictionaries defined the term, but also because those dictionary definitions were consistent with the first of the two alternative definitions set out in the patent specification. *Id*.

As will be further discussed below, here (as in *Abbott*) column 7's many alternative proposed definitions for "the effects by food are reduced" (and thus, for "reduced food effect") could well conflict with each other in a meaningful way when it comes to the infringement analysis. As a result, the Court will assume *arguendo* that Plaintiffs are correct that, pursuant to *Abbott*, the '451 patent's alternative definitions for "the effects by food are reduced" are not sufficiently clear so as to amount to lexicography as to the meaning of both that term and the related term "reduced food effect."[11] Nevertheless, for reasons the Court will explain below, this portion of column 7 is still helpful to Defendants' indefiniteness argument.

---

[11] Defendants attempted to distinguish *Abbott* on this point in their briefing and during the March 19 hearing. The Court, however, did not find their efforts to be particularly persuasive. In their briefing, Defendants suggested that in *Abbott* the Federal Circuit "was asked to choose between two related express definitions in the specification and selected the broader definition, relying on how the term was defined in extrinsic technical dictionaries"—an outcome that Defendants suggest was contrary to later Federal Circuit decisions that "rejected this practice of elevating extrinsic evidence above intrinsic evidence[.]" (D.I. 189 at 4) But in *Abbott*, the Federal Circuit was not somehow wrongly "elevating extrinsic evidence above intrinsic evidence"; instead, it was noting that alternative definitions found in the patent did not amount to clear lexicography, and then it looked to a combination of extrinsic and intrinsic evidence to discern the meaning of the term at issue to a POSITA. Additionally, during the March 19 hearing, Defendants' counsel attempted to distinguish *Abbott* from our case by saying that the former "involved two conflicting definitions that were in different portions of the specification clearly for different embodiments." (Tr. at 65) But that is not so. In *Abbott*, the two different definitions at issue (like here) were found in the same paragraph of the specification (not in "different portions" thereof). 334 F.3d at 1354-55. And that paragraph made no reference to "different embodiments." *Id*.

This is because even if column 7 did not provide one, clear explicit definition for "reduced food effect," it does seem to be providing *multiple possible, plausible definitions* for that term. It is not clear to the Court that "reduced food effect" has a universally understood plain and ordinary meaning. And so column 7's content puts a fine point on the difficulty here for Plaintiffs. It demonstrates just how important it is that, among the wide array of possibilities out there, the record needs to indicate with reasonable certainty *just what is the actual definition* of "reduced food effect" that a POSITA should use in order to understand how the claimed invention works. Put differently, column 7 highlights the criticality of this further question: Of all of the possible definitions for "reduced food effect" that there could be in this art, *which one does the patent mean to use*?[12]

Column 7 also helps further explain why the answer to this question matters in the definiteness inquiry. That is because it seems undisputed that column 7's proffered possible alternative definitions for "the effects by food are reduced" each could (were they an actual definition of "reduced food effect") lead to *different outcomes* as to whether a method met the limitations of claims 4-6. (Chambliss Decl. at ¶ 244 (Dr. Chambliss explaining that "[d]ue to variability in pharmacokinetics and within the comparisons itself, a sustained release mirabegron tablet formulation could fall within the scope of all, none or some of the distinct and potentially contradictory possible meanings of 'reduced food effect'"); *see also* Tr. at 288 (Dr. Chambliss

---

[12]    The Court notes that no party, including Plaintiffs, is arguing that a "reduced food effect" means *any* reduction (i.e., anything more than zero reduction) in food effect. Instead, as the proffered definitions in column 7 and the wording in Example 10 seem to indicate, the claims require a reduction in food effect that is *significant enough* in order to qualify as a "reduced food effect." (*See, e.g.*, '451 patent, col. 44:36-39 ("These results indicated that the reductions of Cmax and AUC caused by food intake could be *significantly alleviated* by the pharmaceutical composition for modified release of the present invention.") (emphasis added)) The question is: *How* significant?

explaining that the POSITA "would know that there was different definitions [for 'reduced food effect' in columns 7-8] and those different definitions would lead to different outcomes")) Indeed, during the March 19 hearing, even Plaintiffs' counsel acknowledged that these "different definitions" in column 7 "conflict" and "compet[e]" with each other—in a manner that could render it "confusing" to a POSITA, were all of them meant to simultaneously define "reduced food effect." (Tr. at 30-31) This is significant as to the issue of definiteness because Federal Circuit caselaw indicates that a claim is indefinite if: (1) one of its terms could have various different meanings to a POSITA, (2) the patent does not provide sufficient guidance as to which meaning to use, and (3) use of those different definitions could produce different results when determining whether or not an accused product infringes. *See Dow Chem. Co. v. Nova Chems. Corp. (Can.)*, 803 F.3d 620, 631-35 (Fed. Cir. 2015); *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341-45 (Fed. Cir. 2015).

In sum, column 7 provides multiple different possible definitions for "the effects by food are reduced." Those proffered definitions appear meant to also shed light on what the (very similar) term "reduced food effect" could mean. And while even though column 7's use of these alternative definitions may not be clear enough to meet the standard for lexicography, it only underscores the potential for undue ambiguity as to the actual meaning of "reduced food effect" to a POSITA. Thus, Column 7's content bolsters Defendants' indefiniteness argument.

With that said, and despite the above-described potential for confusion as to the meaning of the use of "reduced food effect" in the patent, Plaintiffs propose a construction (or, perhaps, multiple constructions) for that term. Do those proposals provide needed clarity with regard to the term's meaning? The Court turns next to that question.

## 2. Plaintiffs' Proposed Constructions

Perhaps somewhat unusually, the parties dispute whether Plaintiffs proposed just one construction for "reduced food effect," or whether they proposed two different constructions for the term. Defendants assert that the latter is the case. They point to the fact that in Plaintiffs' opening brief, Plaintiffs (citing to Dr. Taft's initial declaration) stated that: (1) when used in claim 1's preamble, a POSITA would understand the phrase "[a] method for treating overactive bladder such that the treating is with a reduced food effect" to mean "a method for treating overactive bladder *without clinical impact by food*"; and (2) a POSITA would understand claim 1's limitation that "wherein the reduced food effect is compared to that after oral administration of an immediate release formulation comprising [mirabegron]" to mean "*the food effect* observed after oral administration for the sustained release formulation of mirabegron *is compared to the food effect* observed after oral administration of an immediate release formulation of mirabegron." (D.I. 189 at 3 (citing D.I. 99 at 4-5, 6-7) (emphasis added))[13]

In his reply declaration, Dr. Taft disputed Defendants' claim that he put forward two different constructions for this term. (D.I. 144, ex. A at ¶ 8) Therein, Dr. Taft seems to say that the term "reduced food effect": (1) "is assessed by using the ratios of the Cmax and AUC parameters in the fasted and fed states" and that (2) a POSITA would understand the term as it is used in claim 1's preamble to mean "a method for treating overactive bladder that can be administered orally without clinical impact by food." (*Id.*)

Candidly, the Court found this aspect of Plaintiffs' briefing (and Dr. Taft's testimony) to be a bit confusing. Plaintiffs never succinctly, clearly indicate what is the one, understandable construction that the Court should utilize as to this term. And they had multiple opportunities to

---

[13]     For their part, Defendants do not offer a proposed construction for "reduced food effect."

provide such clarity.  In any event, analyzing any of the proposals Plaintiffs make does not assist with the definiteness question; if anything, it muddies the waters.

For example, take Plaintiffs' suggestion that "reduced food effect" means "without clinical impact by food."  As Defendants point out, the phrase "without clinical impact" is used nowhere in the patent.  (D.I. 189 at 3; Tr. at 149-50)  And that proposal merely begs the following questions:  What does it *mean* to be "without clinical impact" by food?  What methodology should be used to make that determination?  And how does this phrase provide clarity as to what is a "*reduced* food effect"?  On these questions, Plaintiffs and Dr. Taft appear to be silent.  (D.I. 189 at 3)[14]

As for Plaintiffs' use of the phraseology "the food effect observed after oral administration for the sustained release formulation of mirabegron is compared to the food effect observed after oral administration of an immediate release formulation of mirabegron[,]" this too seems to provide more questions than answers.  The proposed construction (if that is what it is) omits the word "reduced," and yet again provides no indication as to how a POSITA would measure the requisite reduction in food effect.  (*Id.*)  It simply requires a "comparison" of two food effects—seemingly with no "reduction" required.  (*Id.*)

In the end, Plaintiffs' claim construction proposals are vague and confusing.  And they do not appear to even attempt to speak to what "reduced" actually means.  Thus, the Court cannot adopt those proposals.  Nor does it believe that if it did, those constructions would move the ball forward in terms of possibly rendering the claims definite.

---

[14]     It seems that another of Plaintiffs' experts, Dr. Victor W. Nitti, MD provided an explanation of what "without clinical impact" could mean, albeit in a different context.  Dr. Nitti stated that the term means "without the risk of increased side effects stemming from patient non-compliance."  (Nitti Decl. at ¶ 35)  If that is so, the Court does not see what it has to do with an articulation of the meaning of "reduced food effect."

Therefore, a final question for the Court is:  Does the record provide *any other* form of reasonable certainty to a POSITA as to what "reduced food effect" means in the context of its use in the '451 patent?  Plaintiffs argue that one portion of the patent does fit this bill:  Example 10.  And so the Court next turns to the merits of that assertion.

### 3.   Example 10

Example 10 in the '451 patent is titled "Pharmacokinetics (PK) Test of Sustained Release Hydrogel-Forming Formulation in Human[.]"  ('451 patent, col. 44:6-8)  It describes the results of food effect studies comparing the food effect observed in groups of patients when they were administered immediate release and sustained release formulations including mirabegron.  (*Id.*, col. 44:6-46)  Overall, Example 10 sets out one example of how a reduced food effect could be assessed.  (Tr. at 107)  Example 10 provides:

> The pharmaceutical composition for modified release of the present invention prepared in Example 1A or 1B (containing compound A in an amount corresponding to 200 mg) was administered to healthy subjects in a fasted state (Fasted) or after 30 min from the intake of a meal (Fed), and the drug concentration in the plasma was measured.  On the other hand, two capsules of the pharmaceutical composition (conventional formulation) (containing compound A in an amount corresponding to 160 mg) of Comparative Example 1 was administered to healthy subjects in a fasted state or after 30 min from the intake of a meal, and the drug concentration in the plasma was measured.

> The results in the pharmaceutical composition for modified release of the present invention prepared in Example 1A are shown in FIG. **12**, and the results in the pharmaceutical composition for modified release of the present invention prepared in Example 1B are shown in FIG. **13**, respectively.

> With respect to the conventional formulation, the rate of decrease of Cmax in the fed state was 67%, in comparison with that in the fasted state, and the rate of decrease of AUC was 47% (Cmax in the fasted state was approximately three times higher than that in the fed state).  With respect to the pharmaceutical compositions for modified release (1A and 1B) of the present invention, the rates of

decrease of Cmax in the fed state were 4% and 10%, in comparison with those in the fasted state, and the rates of decrease of AUC were 10% and -4%. These results indicated that the reductions of Cmax and AUC caused by food intake could be *significantly alleviated* by the pharmaceutical composition for modified release of the present invention.

Furthermore, the maximum plasma concentration after the administration of the pharmaceutical composition for modified release prepared in Example 1A of the present invention was 274 ng/mL and 264 ng/mL in the fasted state and in the fed state, respectively. Similarly, in Example 1B, they were 155 ng/mL and 140 ng/mL, respectively. Furthermore, the increase in heart rate is 13 bpm or less in both.

('451 patent, col. 44:6-46 (emphasis added))

Example 10 describes two clinical studies conducted by Plaintiffs. One study, the 178-CL-001 study (the "001 study"), measured the food effect in patients taking 160 mg of an immediate release capsule formulation of mirabegron. (D.I. 100, ex. 23; Taft Decl. at ¶ 102; D.I. 104 at ¶ 25) The second study, the 178-CL-030 study (the "030" study), assessed three different sustained release mirabegron formulations—OCAS-Fast (or "OCAS-F"), which is described as Example 1A in Example 10, OCAS-Slow (or "OCAS-S"), which is described as Example 1B in Example 10, and OCAS-Medium (or "OCAS-M"), which is not discussed at all in Example 10. (Chambliss Decl. at ¶¶ 267-68; D.I. 100, ex. 24 at ASTIMIRA_00040600-01) Each of these formulations was given to a different patient group (groups A, B and C) under both fed and fasted conditions in a 200 mg dose. (Chambliss Decl. at ¶ 267; D.I. 100, ex. 24 at ASTIMIRA_00040600-01) That is, group A received OCAS-F, group B received OCAS-S and group C received OCAS-M. (D.I. 100, ex. 24 at ASTIMIRA_00040601) Each group participating in the 030 study also was administered an immediate release formulation of mirabegron (200 mg total) in the fasted state only, the results of which are not discussed in Example 10. (*Id*. at ASTIMIRA_00040600-01; Chambliss Decl. at ¶ 269)

26

Example 10 first sets out the results from the 001 study (which, again, was a study wherein the subjects took the immediate release formulation capsules with and without food). The patent reports that these results showed that taking the immediate release capsules with food reduced Cmax by 67% and AUC by 47%, as compared to when the capsules were taken without food. ('451 patent, col. 44:27-31)  Dr. Taft described this result as demonstrating a "substantial food effect because the systemic exposure of the drug is considerably different between the fed and fasted states, which could lead to a meaningful clinical impact."  (Taft Decl. at ¶ 37) Example 10 then goes on to describe the results of the 030 study—particularly the results of the groups referred to in Examples 1A and 1B.  For the group in Example 1A, it is said that there was a 4% reduction in Cmax and a 10% reduction in AUC in the fed state compared to the fasted state. ('451 patent, col. 44:31-36)  For the group in Example 1B, it is said that there was a 10% reduction in Cmax and a -4% reduction in AUC in the fed state compared to the fasted state. (*Id*.)  And in Example 10, the patent states that the Example 1A and 1B results thus showed that the reductions of Cmax and AUC caused by food intake could be "significantly alleviated" by the sustained release formulation of the present invention—i.e., that these examples, according to Dr. Taft, demonstrated how such a formulation could in fact demonstrate a "reduced food effect."  (*Id*., col. 44:36-39; Taft Decl. ¶ 42; Tr. at 109-11)  This was apparently because the rates of decrease of Cmax and AUC in the fed state in comparison with the fasted state observed in the groups taking the "conventional" immediate release formulation described in Example 10 were much, much greater than they were in the results drawn from Example 1A and 1B.  ('451 patent, col. 44:27-39; Taft Decl. ¶¶ 41-42)

Plaintiffs assert that Example 10, in conjunction with the FDA Food Effect Guidance ("FDA Guidance"),[15] provides a POSITA with the information he or she would need to recreate the study and therefore to understand how to measure a "reduced food effect." (D.I. 141 at 7; D.I. 188 at 6)  Indeed, Dr. Taft stated that Example 10 is the place where the '451 patent "describe[s] how the reduction in the food effect is assessed[.]"  (Tr. at 107)  Based on the record before it, however, the Court disagrees that the content of Example 10 (even considered along with the FDA Guidance) renders the claims definite.

For one thing, even to the extent that Example 10 can be argued to provide a few data points regarding what might possibly count as an example of a "reduced food effect" (i.e., the difference between a 67% reduction in Cmax and a 47% reduction in AUC as described in the 001 study, on the one hand, and a 4% reduction in Cmax and a 10% reduction in AUC as described in Example 1A, on the other hand), there is no real indication in the patent as to what the *outer bounds* of a qualifying reduction would be.  What if the reduction at issue is far lesser than what is being described there in Example 10?  Would it still qualify as demonstrating a "reduced food effect"?  The intrinsic record does not say.  *See, e.g.*, *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1373-74 (Fed. Cir. 2014) (concluding that the claims' use of "unobtrusive manner" rendered them indefinite, where the specification provided a single

---

[15]     The FDA Guidance provides detailed descriptions of how to conduct food effect studies.  (Taft Decl. at ¶ 34)  The Court agrees with Plaintiffs that the FDA Guidance can be taken into account in assessing how a POSITA would view the Asserted Patent (even though this guidance it is not mentioned specifically in that patent), since it is undisputed that a POSITA would be familiar with this guidance and would consider it to be the "primary" or "main" form of guidance with regard to how to conduct a food effect study.  (*Id*. at ¶¶ 34-35; Tr. at 248-51 (Dr. Savic acknowledging that the FDA Guidance is the "main" or "primary" guidance in this arena))  This is because a patent need not explicitly include information that is already well known in the art.  *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1376 (Fed. Cir. 2017).

example of what would qualify, but where a POSITA "is still left to wonder what other forms of

display are unobtrusive and non-distracting"); *Dominion Assets LLC v. Masimo Corp.*, Case No.

14-cv-03002-BLF, 2017 WL 10592326, at *4-5 (N.D. Cal. Jan. 20, 2017) (finding that the terms

"large" and "closely-spaced" rendered the claims indefinite, because while the specification

provided information for a POSITA to "know that 93-140 wavelengths is a 'large' number, and

an interval within 10-15 nm is 'closely-spaced[,]'" the specification "gives no indication of what

point a set of discrete wavelengths stops being 'large' or 'closely-spaced'").

      In addition, Defendants' experts also cogently explained why—even if one solely looked

at the specific results reported in Example 10—a POSITA would *still* have difficulty

understanding what the patent means to disclose there as being exemplary manifestations of a

"reduced food effect."  In this regard, Defendants' experts point to various shortcomings with

Example 10, noting that it fails to disclose key study parameters that a POSITA would need to

understand in order to figure out how to assess whether a sufficiently "reduced food effect" has

in fact occurred.  (Savic Decl. at ¶ 74)  For example, Dr. Savic states that Example 10 fails to

provide:  (1) confirmation that the studies described therein were done on the same subjects, the

same number of subjects, for the same length of time, or at the same time; (2) a justification as to

why different dosage amounts (160 mg vs. 200 mg) and dosage forms (tablet vs. capsule) were

compared; and (3) specificity as to what type of meal (e.g., a high-fat meal or a low-fat meal)

was provided to the subjects.[16]  (*Id*. at ¶ 75 (Dr. Savic explaining that in light of these issues and

others, a POSITA "would be unable to replicate Example 10 or otherwise design a study to

---

[16]     Dr. Savic actually testified that there were many other "key factors" regarding a
food effect study that could affect study outcomes, and that are not addressed in Example 10 or
elsewhere in the '451 patent.  (Savic Decl. at ¶ 77)  However, the Court will focus on some of the
factors referenced above because they received the most attention in the briefing.

determine whether a product falls within the asserted claims based on Example 10."); *see also* Chambliss Decl. at ¶¶ 266-67 (Dr. Chambliss stating the same); DDX3-18-20 (same); Tr. at 291 (same))

To demonstrate why these issues matter to the definiteness inquiry, the Court will focus below on two factors referenced above that were noted by Defendants' experts: (1) the fact that the study subjects being compared in Example 10 could be (and in fact actually were) different subjects (i.e., different patient populations), and (2) the fact that the studies being compared used different dosages of the drug products at issue.[17] (D.I. 189 at 2; Tr. at 221, 223-24)

With regard to patient population, Example 10 provides no indication as to whether the respective studies discussed therein used the same or different patient populations (though there is no dispute that, in actuality, different subjects participated in the 001 study and in each of the

---

[17]     As noted above, Defendants also argue that Example 10 does not provide information on the type of meal administered to the subjects in the different reported studies, including whether the meal they ate before taking the drug was a high-fat or low-fat meal. Defendants provided expert testimony indicating that knowing whether the subjects described in Example 10 ate a high-fat or low-fat meal could matter, in terms of being able to understand how the reported reduced food effect should be accurately assessed. (Savic Decl. at ¶ 77; DDX2-18) That is because in general, "meals that are high in total calories and fat content are more likely to affect the GI physiology and thereby result in a larger effect on the [bioavailability] of a drug substance or drug product." (D.I. 101, ex. 15 at DEFS-MIRAII-000865; *see also* Taft Decl. at ¶ 34)

Plaintiffs counter, however, by asserting that even though Example 10 does not specifically state what type of meal the study participants ate, a POSITA would know that the participants would have been given a high-fat meal. They explain that this is so because the relevant portion of the FDA Guidance explains that the standard conditions typically used to assess food effect are with fasted patients in comparison with patients that have consumed a high-fat meal. (D.I. 101, ex. 15 at DEFS-MIRAII-000869-71; Taft Decl. at ¶¶ 34, 35; Savic Decl. at ¶ 36; Tr. at 251) (Indeed, it appears that in the actual studies referenced in Example 10, high-fat meals were in fact used in this way for the fed state.). (Taft Decl. at ¶¶ 102 n.28, 105; D.I. 144, ex. A at ¶ 20; Tr. at 111) Because there is good record indication that a POSITA would understand that Example 10 is referring to subjects who were given high-fat meals in the fed state, the Court will not consider this as a point that suggests that "reduced food effect" is indefinite.

three groups in the 030 study).  (Savic Decl. at ¶ 77; Chambliss Decl. at ¶ 285; Tr. at 292)  And

Dr. Chambliss explained why this would create significant ambiguity for a POSITA as to the

meaning of "reduced food effect."  That is because if different study populations are used in

comparing results for issues like a reduction of food effect, this can create undue variability in

understanding whether a particular sustained release formulation would fall within the scope of

the claims.  (Tr. at 287-90; Chambliss Decl. at ¶ 270)  By way of example as to how this might

be so, Dr. Chambliss discussed the actual results of the 030 study—a study wherein the

participants in each group were administered the same immediate release formulation in the

same dosage (200 mg taken twice daily) in the fasted state.  (Chambliss Decl. at ¶¶ 269-70)  The

mean Cmax value for the immediate release tablets in the group also taking OCAS-F was 245

ng/ml, while the mean Cmax value for the immediate release tablets for the group also taking

OCAS-S was 213 ng/ml.  (*Id.* at ¶ 270)  This means that the mean Cmax value in the group also

taking OCAS-S was 15% lower than the mean Cmax in the group also taking OCAS-F.  (*Id.*)[18]

This difference shows the inherent variability of PK data in different patient populations, and

how this variability can materially affect the results of PK studies.  (*Id.* at ¶¶ 270-74; Tr. at 288-

90; *see also* Savic Decl. at ¶¶ 77-78 (noting that "[p]atient population" is a factor that can impact

study outcomes, and that differences in that factor could change the results of a study in terms of

pharmacokinetics and evaluation of food effects))

---

[18]    Plaintiffs attack Dr. Chambliss' reliance on this data from the 030 study, arguing
in part that a POSITA would not have had access to the actual study results, such that the data
discussed therein should have no bearing on the meaning of the claim terms.  (D.I. 188 at 5)  But
in the Court's view, Dr. Chambliss' point here is that these results are simply illustrative of what
a POSITA *would otherwise know*—i.e., that differences in patient populations can have a
material impact on food effect results, and that one would have to know how a patentee
accounted for such differences in order to understand what the patent contends amounts to a
"reduced food effect" in Example 10.

To apply this lesson to Example 10, recall that Example 10 appears to compare a 67%
reduction in Cmax for the subject group who took the conventional, immediate release
formulation with the 4% and 10% reductions of Cmax for the subject groups in Example 1A and
1B who took the sustained release formulation. ('451 patent, col. 7:27-39) And also recall Dr.
Taft's conclusion that this difference is a concrete example of what a POSITA can look to in
order to understand what "reduced food effect" means. But since a POSITA would have to
consider that the respective subject populations being compared could all have been different,
and since the biological differences in such populations could significantly affect the respective
subjects' Cmax results, then one would need to know how the inventors accounted for such a
variable in comparing the respective Cmax percentage reductions and deeming them an example
of a drug-related "reduced food effect." Yet the patent does not disclose how the inventors did
so (if they did so at all). Nor is such guidance provided in any other source of record. If these
patient population differences, once corrected for, could swing the measured reduction at issue
by 15% or more, that in turn could have an impact on what the claimed "reduc[tion]" actually
is—and on whether a POSITA could confirm whether the requisite reduction had actually been
reached in any given case. (Chambliss Decl. at ¶¶ 270-74; DDX3-19; Tr. at 288-90; *see also*
Savic Decl. at ¶ 78) In such a situation, the claims could well be found indefinite. *See Forest
Lab'ys, Inc. v. Teva Pharms. USA, Inc*., C.A. No. 14-121-LPS, 2016 WL 54910, at *8-9 (D. Del.
Jan. 5, 2016) (concluding that claims were indefinite when they included the term "as measured
in a single-dose human PK study[,]" but where a POSITA would not know, with reasonable
certainty, which human PK study to rely on in considering whether a particular drug formulation
infringed certain asserted patents, and where there was only one actual human PK study
disclosed in the intrinsic evidence—but nothing in the intrinsic evidence indicated how a human

PK study should be conducted (which was problematic because measurements from such studies vary widely in material ways)), *aff'd* 716 F. App'x 987 (Fed. Cir. 2017); *see also Pac. Coast Bldg. Prods., Inc. v. CertainTeed Gypsum, Inc.*, 816 F. App'x 454, 459 (Fed. Cir. 2020) (concluding that the asserted patent failed to provide guidance to a POSITA for how to measure "scored flexural strength" with reasonable certainty, rendering the claims indefinite, where although the claims recited a particular value for "scored flexural strength," "the claims and the specification fail to explain what the value represents or how to consistently and reproducibly measure this new characteristic").

Additionally, as noted above, Example 10 compares the results of subjects who took a 160 mg dose of the immediate release formulation with the results from subjects who took a 200 mg dose of the sustained release formulations. Dr. Savic explained that "food effect can be dependent on the dose of the drug" provided, in that "you can see one food effect at one dose, and yet another food effect at [a] different dose." (Tr. at 219) Dr. Chambliss testified similarly. (*Id*. at 291) And Dr. Savic further noted how a POSITA would know of the need to "make [] adjustments" in accounting for the results with regard to these different dosage regimes—and yet the patent provided no clarity on "how to quantify" this difference and/or the impact that it has on Example 10's statements about what constitutes a "reduced food effect." (*Id*. at 219-21; *see also* Savic Decl. at ¶¶ 76-78; DDX2-19) Where a POSITA would need to make alterations to the percentages of rates of decrease in Example 10 for this reason in order to understand what a "reduced food effect" is, but where the patent provides no indication as to how to do that, this further indicates why a POSITA would not be able to determine the bounds of the claims with reasonable certainty.

The Court also notes that Plaintiffs' response to these points did not add clarity.  *See Forest Labs.*, 2016 WL 54910, at *9 (noting that the Court's decision that a claim was indefinite was bolstered by the fact that the plaintiffs' expert had provided "no persuasive response").  In their briefing, Plaintiffs responded on these points by citing to certain paragraphs of Dr. Taft's declaration, and by stating that "a POS[IT]A would understand how to conduct and compare the clinical studies [referenced in Example 10], including using the FDA's food effect guidance." (D.I. 141 at 7 (citing Taft Decl. at ¶¶ 101-06))  But the Court has reviewed the cited portions of Dr. Taft's declaration, and it does not see where they address Defendants' criticisms of Example 10's lack of guidance discussed above.  And therein, Dr. Taft concludes that the results of the 030 study (including Examples 1A and 1B listed in Example 10) show "[geometric mean ratio, or 'GMR'] values, as compared to the immediate release formulation, are *significantly* higher, indicating a reduced food effect for the OCAS formulations versus the immediate release formulations."  (Taft. Decl. at ¶ 105 (emphasis added))  But again, this just begs the question: How "significant" must the difference be (and how should a POSITA determine that)?  And again, we are left with no good answers.

Therefore, Example 10 does not bring needed clarity to a POSITA's understanding of what a "reduced food effect" means in the patent.

IV.    **CONCLUSION**

As the Court noted at the outset, the issuance of a preliminary injunction is a drastic and extraordinary remedy.  And the Court takes care to note that although the record before it was substantial, it may not have had all of the evidence on the question of definiteness that a judge might later have at trial.  Indeed, the question before the Court now is not whether Defendants have *proven* invalidity, but instead only whether they have put forward a "substantial question"

of invalidity in order to show that the claims at issue are *vulnerable* to such a charge. For the reasons set out above, the Court concludes that they have. Relatedly, it concludes that Plaintiffs did not meet their burden to provide a "clear case" supporting the validity of the Asserted Patent. As a result, the Court determines that Plaintiffs are not entitled to the very extraordinary remedy that they seek. It thus recommends that Plaintiffs' Motion be DENIED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The failure of a party to object to legal conclusions may result in the loss of the right to *de novo* review in the district court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Because this Report and Recommendation may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Report and Recommendation. Any such redacted version shall be submitted no later than **April 26, 2024** for review by the Court. It should be accompanied by a motion for redaction that shows that the presumption of public access to judicial records has been rebutted with respect to the proposed redacted material, by including a factually-detailed explanation as to how that material is the "kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure." *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d

Cir. 2019) (internal quotation marks and citation omitted).  The Court will subsequently issue a

publicly-available version of its Report and Recommendation.

Dated:  April 19, 2024

_____
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE