IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ASTELLAS PHARMA INC., ASTELLAS IRELAND CO., LTD., and ASTELLAS PHARMA GLOBAL DEVELOPMENT, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>LUPIN LTD., LUPIN PHARMACEUTICALS, INC., ZYDUS PHARMACEUTICALS (USA) INC., and ZYDUS LIFESCIENCES Limited<br><br>Defendants. | CIVIL ACTION NO. 23-819-JFB-CJB<br><br>MEMORANDUM AND ORDER |

## I.    INTRODUCTION

This matter is before the Court on the parties' motion for claim construction.  D.I. 110; D.I. 111.  This is a patent infringement case involving United States Patent No. 11,707,451 ("The 451 Patent"), a patent for a method to use a sustained released mirabegron formulation to treat overactive bladder under the brand name Myrbetriq®. Plaintiffs, Astellas Pharma Inc., Astellas Ireland Co., Ltd., and Astellas Pharma Global Development, Inc. ("Astellas") developed the drug and owns the patent.  D.I. 1. Defendants, Lupin Ltd., Lupin Pharmaceuticals, Inc., Zydus Pharmaceuticals (USA) Inc., Zydus Lifesciences Limited (collectively "Generics Manufacturers") manufacture generic versions of the drug.  *Id.*  Astellas alleges the generic drugs infringe on the 451 Patent. *Id.* The parties summitted a Joint Claim Construction Chart and Appendix and a Joint Claim Construction Brief and Appendix.  D.I. 108 (Claim Construction Chart); D.I. 109 (Claim Construction Chart Appendix); D.I. 260 (Joint Brief); D.I. 261 (Joint Appendix).

1

The Court adopts the following constructions:

| Term | Astellas's Proposed Construction | The Generics Manufacturers' Proposed Construction | The Court's Construction |
|---|---|---|---|
| Reduced food effect | Plain and ordinary meaning (a reduction in a change in mirabegron absorption measured as a difference in $C_{max}$ and AUC in the fed and fasted states associated with the sustained release formulation as compared to a difference in $C_{max}$ and AUC in the fed and fasted states associated with an immediate release formulation). | Indefinite | A clinically significant reduction, where the reduction is expressed by a positive percent reduction in the rate of decrease of $C_{max}$ and AUC, in a change in mirabegron absorption measured as a difference in $C_{max}$ and AUC in the fed and fasted states associated with the sustained release formulation as compared to a difference in $C_{max}$ and AUC in the fed and fasted states associated with an immediate release formulation. |
| Immediate Release Formulation | Plain and ordinary meaning (a formulation that does not control the release of the drug when taken orally).<br><br>Alternatively, immediate release formulation of Comparative Example 1. | Indefinite | Immediate release formulation of Comparative Example 1. |
| Continuous drug release for at least four hours after oral administration. | Plain and ordinary meaning (continuous drug release for at least four hours *in vivo* after oral administration). | Indefinite | Plain and ordinary meaning (continuous drug release for at least four hours *in vivo* after oral administration). |

The Court, like Judge Burke, acknowledges that the 451 Patent is not the model of clarity and the claims as constructed appear to be exceptionally broad. However, at

this stage the Generics Manufacturers have not carried their burden of showing indefiniteness by clear and convincing evidence. Moreover, Astellas provided a construction of the claim that is consistent with the intrinsic evidence and avoids many of the pitfalls identified by Magistrate Judge Burke. The Court hopes that the forgoing claim construction provides a measure of clarity for the Parties and their experts to shape their infringement and obviousness analysis. However, if that task proves impossible, the Generics Manufacturers are welcome to reraise the indefiniteness issues, along with other grounds for invalidity, at summary judgment and trial.

## II.    BACKGROUND

### A.  The Technology and Scientific Background

The technology at issue is a sustained release mirabegron formulation used to treat overactive bladder under the brand name Myrbetriq®. Overactive bladder is a condition, affecting millions of Americans, which increases urinary frequency and urgency. D.I. 261 at 49, ¶ 21. Astellas developed Myrbetriq® as an alternative to existing treatments for overactive bladder, a class of compounds called antimuscarinics. *Id.* at 54, ¶ 32. The existing treatments caused unpleasant side effects, which limited their clinical efficacy. *Id.* Astellas found that Mirabegron treated overactive bladder without the side effects that limited the efficacy of prior treatments. *Id.* at 55–56, ¶¶ 34–36.

Initially, Astellas developed an immediate release formulation of mirabegron. D.I. 261-1 at 50, ¶ 24. An immediate release formulation does not contain any features, such as a chemical coating, that delay the release of the active ingredient. Instead, the drug tablet begins to break down and release the active ingredient upon impact with the stomach. D.I. 261-1 at 265–66, ¶ 66. An immediate release formulation is distinct from

a sustained release formulation, which contains chemical compounds that control the breakdown of the drug within the stomach. *Id.*

Astellas discovered a significant clinical limitation associated with the immediate release formulation of mirabegron. D.I. 261-1 at 50–51, ¶¶ 24–25. Specifically, when the drug was taken on a full stomach, it generally metabolized in a safe and predictable manner. *Id.* However, when the drug was taken on an empty stomach, the concentration of the drug in the bloodstream spiked. *Id.* The spike in the concentration of mirabegron in the bloodstream caused undesirable side effects, including increased heart rate that limited the clinical efficacy of the drug. *Id.* ¶ 26. Pharmacokineticists refer to this phenomenon, where a drug behaves differently when taken on a full versus empty stomach, as a food effect. D.I. 261-1 at 155, ¶¶ 24–27.

Astellas observed and measured the food effect in studies where healthy participant took the drug orally. *Id.* ¶ 28. Scientists then took blood samples over the course of the next several hours and measured the concentration of mirabegron at each time point. *Id.* Scientists then plotted the data to create a curve that modeled the concentration of the drug in the bloodstream over time. *Id.* ¶ 29. Based on the curve, scientists were able to calculate the key pharmacokinetic parameters, the area under the curve (AUC) and the maximum concentration ($C_{max}$) of the drug. *Id.* ¶ 32. The AUC indicates the total exposure of the drug over the period tested. *Id.* ¶ 29. $C_{max}$ reflects the peak concentration of the drug in the bloodstream during the period. *Id.* The food effect study compared the blood concentration profiles for participants who took the drug on an empty stomach versus participants who took the drug after eating a meal. D.I. 261-1 at 155 ¶ 27, 32. The study found that participants who took drug on an empty stomach had

a larger AUC and higher C_max than participants who took the drug after eating a meal. *See* D.I. 261-1 at 38. In layman's terms, this means the participants who fasted were exposed to more of the drug over a shorter time and the concentration in their blood spiked to higher levels. This higher total exposure and peak concentration accounted for the side effects observed in patients who took mirabegron on an empty stomach. D.I. 261-1 at 51, ¶ 25; D.I. 261-1 at 38, 15, fig. 11.

To address the problematic food effect, Astellas developed a sustained release formulation of mirabegron. D.I. 261-1 at 52, ¶ 27. The sustained release formulation uses a chemical compound to ensure the drug is metabolized at a more stable rate over the course of four hours. *Id.*, and 17. This development prevented the stomach from uncontrollably metabolizing the drug. Astellas tested the controlled release formulation in a similar food effect trial to the immediate release formulation. *See* D.I. 261-1 at 38. They found that, unlike the immediate release formulation, participants in the fed and fasted states, had similar AUC and C_max measures. *Id.* Specifically, Astellas observed a 67% rate of decrease in C_max and a 47% rate of decrease in AUC in the immediate release formula. *Id.* In the two sustained release formulations, the rate of decrease measures were 4% and 10% for C_max and 10% and -4% for AUC. *Id.* Crucial to the clinical problem at hand, participants who received the controlled release formulation did not experience the problematic side effects that had, so far, limited the clinical utility of mirabegron as a treatment for overactive bladder. *Id.*, and 53–54, ¶¶ 29–31.

**B. Prosecution History**

Astellas applied for the 451 Patent in 2020. D.I. 261-2 at 27. Initially the claimed language was "a method of treating overactive bladder and reducing food effect" but

Astellas amended the term to "such that treating is with a reduced food effect" in response to the examiner's confusion over whether food effect was a separate condition to be treated. *See id.* at 97, 100. The United States Patent and Trademark Office issued the 451 Patent on June 1, 2023. *Id.* at 130.

### C.  The 451 Patent

Ultimately, as relevant here,[1] the 451 Patent claims "[a] method for treating overactive bladder such that treating is with a reduced food effect . . . wherein the sustained release formulation further comprises a carrier and provides a continuous drug release for at least 4 hours after oral administration . . . wherein the reduced food effect is compared to that after oral administration of an immediate release formulation . . .." D.I. 261-1 at 38–39.

### D.  Procedural Posture

Astellas filed this patent infringement action, alleging that several of the Generics Manufacturers' products infringe the 451 Patent. D.I. 1. Astellas filed a motion for a preliminary injunction, seeking to enjoin the Generics Manufacturers from marketing the allegedly infringing products. D.I. 98. The Magistrate Judge determined Astellas was not entitled to the extraordinary remedy of a preliminary injunction finding the Generic Manufacturers raised a substantial question of whether the "reduced food effect" term in 451 Patent was invalid as indefinite. D.I. 200 at 34–35. The parties have now moved for claim construction on three terms in the 451 Patent. D.I. 110; D.I. 111.

---

[1] The other claims of the patent (related to the chemical composition of mirabegron and the composition of the sustained release formula) are not at issue here.

## III.    DISCUSSION

The parties submit three claim terms for construction by the Court: (1) "a method for treating overactive bladder such that the treating is with a reduced food effect"/ "wherein the reduced food effected is compared to that after oral administration of an immediate release formulation comprising [mirabegron]," (2) "immediate release formulation," and (3) [c]ontinuous drug release for at least four hours after oral administration."  Astellas proposes the terms should be given their plain and ordinary meaning.  The Generics Manufacturers primarily propose that all three terms are indefinite and cannot be validly constructed.

### A.  The Legal Framework for Claims Construction

The claims of the patent define the metes and bounds of the patent.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).  The claims determine what the inventor patented and "delimit the" patent holder's "right to exclude."  *Id.*  At the claim construction stage, the role of the Court is to "determin[e] the meaning and scope of the patent claimed asserted to be infringed."  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). A claim construction order will dictate how the court will instruct the jury regarding a claim's scope.  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1359 (Fed. Cir. 2008).   Claim construction falls "exclusively within the province of the court."  *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318 (2015) (quoting *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996)).

The goal of claim construction is to articulate how a person of ordinary skill in the art at the time of the patent would understand the claim term.  *Phillips*, 415 F.3d at 1313. The process of construing a claim term begins with the words of the claims.  *Phillips*, 415

F.3d at 1312–14; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "[A]bsent contravening evidence from the specification or prosecution history, plain and unambiguous claim language controls the construction analysis." *DSW, Inc. v. Shoe Pavilion, Inc.*, 537 F.3d 1342, 1347 (Fed. Cir. 2008) (citing *N. N. Telecom Ltd. v. Samsung Elecs. Co.*, 215 F.3d 1281, 1295 (Fed. Cir. 2000)). However, the claims "must be read in view of the specification, of which they are a part." *Phillips*, 415 F.3d at 1315 (quoting *Markman*, 52 F.3d at 979); *see Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 977 (Fed. Cir. 2014) (stating in claim construction, the court "gives primacy to the language of the claims, followed by the specification"). Additionally, the prosecution history, while not literally within the patent document, serves as intrinsic evidence for purposes of claim construction. *See Phillips*, 415 F.3d at 1317. If a claim term remains ambiguous after an examination of intrinsic evidence, the court may resort to extrinsic evidence. *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1332 (Fed. Cir. 2001).

25 U.S.C. § 112(b) provides a patent "specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor or joint inventor of carrying out the invention." A patent claims must, "viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). While "absolute precision is unattainable" "a patent must be precise enough to afford clear

notice of what is claimed." *Id.* at 909–10.  A claim that fails to provide clear notice is invalid as indefinite.  *Id.* at 902; 25 U.S.C. § 282(b)(3).  Like any invalidity defense, indefiniteness must be shown by clear and convincing evidence.  *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 95 (2011).  A claim term is indefinite if it "departs the realm of recognized methods of measurement" and "leave[s] the skilled artisan to consult the 'unpredictable vagaries of any one person's opinion.'" *Dow Chem. Co. v. Nova Chemicals Corp. (Canada)*, 803 F.3d 620, 635 (Fed. Cir. 2015) (quoting *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1374 (Fed. Cir. 2014).  The Federal Circuit has recognized terms of degree run the risk of indefiniteness and though the patent drafter need not provide mathematical precision, they must provide some "objective baseline" for the POSA to engage in comparison.  *Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1378 (Fed. Cir. 2017).

### B.  The POSA

The Parties broadly agree on the identity of the person of ordinary skill in the art (POSA) but differ slightly in the details.   Definiteness and claim construction are approached from the perspective of someone skilled in the relevant art at the time the patent was filed.  *Nautilus, Inc.*, 572 U.S. at 908.  The POSA is someone who understands the technical field and can draw on their specialized knowledge to understand the scope of claim terms.  Here, Astellas' expert, Dr. Taft, describes the POSA as

> a multidisciplinary team with (1) a Ph.D. in pharmaceutical sciences or a related field and approximately two to three years of experience, research, and/or training in pharmacokinetics, food effects, formulation, and characterization of pharmaceutical dosage forms; alternatively, a POSA could have had a bachelor's degree in pharmaceutical sciences or a related field with a greater amount of experience, research, and/or training in pharmacokinetics, food effects, formulation, and characterization of pharmaceutical dosage forms; and (2) a medical doctor with at least two

years of practical experience administering pharmaceutical drugs to treat overactive bladder ("OAB") with symptoms of urgency, urinary frequency and/or urge urinary incontinence, in human patients.

D.I. 261-1 at 152, ¶ 15.  Astella's experts agree with Dr. Taft's proposed definition of the POSA.  *See id.* at 45, ¶ 45 (Dr. Nitti).  The Generics Manufacturers' experts articulate a similar idea of a POSA, but rather than an interdisciplinary team, they propose a pharmaceutical expert interfacing as needed with subject matter experts.  *Id.* at 610, ¶ 21 (Dr. Chambliss articulating a POSA definition of a person with experience in pharmaceutical formulation interfacing with subject matter experts such as physicians who treat overactive bladder and biostatistics experts); D.I. 261-3 at 19 (Dr. Savic articulating a similar POSA definition).  The Court agrees with Dr. Taft's proposed definition of the POSA.  The 451 Patent draws on concepts from pharmacokinetics and problems related to the treatment of overactive bladder.  As discussed below, understanding the scope of the patent includes both a pharmacokinetic and clinical dimension.  Therefore, it is best understood by a multidisciplinary team that understands both the science of drug absorption and the clinical context for the problem.  The proposed POSA definition is consistent with the multidisciplinary way drugs are designed, with formulation experts working closely with clinicians to determine the boundaries of existing pharmaceutical innovations.  Therefore, Dr. Taft's proposed POSA definition accurately reflects the "interpretive community" that would be reviewing the claim and is, therefore, consistent with the normative goals of claim construction and indefiniteness.  *See* Laura Pedraza-Fariña & Ryan Whalen, *The Ghost in the Patent System: An Empirical Study of Patent Law's Elusive "Skilled Artisan"*, 108 Iowa L. Rev. 247, 291, 293–94 (2022) (arguing for explicit engagement with the identity of the POSA in light of the normative goals of the area of patent law).

10

**C. "a method for treating overactive bladder such that the treating is with a reduced food effect"/ "[W]herein the reduced food effect is compared to that after oral administration of an immediate release formulation comprising [mirabegron]."**

The Court begins with construction of the claim term "a method for treating overactive bladder such that the treating is with a reduced food effect" and "wherein the reduced food effected is compared to that after oral administration of an immediate release formulation comprising [mirabegron]." Across the preliminary injunction and claim construction process, the parties' disputes have narrowed significantly. Both parties agree that the term "a method for treating overactive bladder" should be given its ordinary meaning. D.I. 260 at 15. Astellas now agrees that "reduced food effect" should be constructed consistently across the patent. D.I. 260 at 31. The parties generally agree on the parameters of the "food effect," meaning "the differences in the absorption of a drug when taken with food as opposed to on an empty stomach." D.I. 261-3 at 730 (Magistrate Judge Burke's Report and Recommendation discussing the parties' expert submissions). Finally, the parties agree that the claim requires more than a de minimis reduction in food effect. D.I. 200 at 21 n.12. Therefore, the parties' remaining dispute centers on the meaning of "reduced." Specifically, the parties disagree on whether the POSA would understand how to measure the reduction in food effect and when the food effect has been sufficiently reduced to fall within the scope of the claim.

The Court recognizes that the stage of the litigation (when the parties have completed preliminary injunction proceedings but have not developed the full record necessary to demonstrate infringement) presents some complications to the analysis. As Judge Burke explained on the preliminary injunction record, the way the term reduced food effect was addressed in the patent and Astellas's shifting explanations in litigation

11

suggests that the POSA may have difficulties using the term to conduct infringement analysis. *See* D.I. 261-3 at 753. However, at the claim construction phase and beyond, the Generics Manufacturers must do more than raise a substantial question about indefiniteness, they must show indefiniteness by clear and convincing evidence. *Microsoft Corp.*, 564 U.S. at 95. In conducting this inquiry, the Court is mindful of Congress's decision that the 451 Patent, like any patent, is presumed valid. 35 U.S.C. § 282. Moreover, even if the Generics Manufacturers can show ambiguity in the claim term, the Federal Circuit recognizes a rule of construction that, in narrow circumstances in "which 'the court concludes after applying all available tools of claim construction that the claim is still ambiguous'" "claims should be constructed to preserve their validity." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1327 (Fed. Cir. 2005) (en banc). Here, Astellas has arrived at a construction that is consistent with the intrinsic and extrinsic record and avoids the pitfalls recognized in the Judge Burke's preliminary injunction order. The Generics Manufacturers and their experts raise arguments regarding the new construction, mostly relating to how much the POSA would be able to fill in from outside the four corners of the patent. These issues are largely factual and best resolved at trial. Therefore, this order does not preclude the Generics Manufacturers from arguing these factual questions and an indefiniteness theory of invalidity to the jury.

The Court concludes, based on the 451 Patent and relevant extrinsic evidence, a POSA would understand "reduced food effect" to mean a clinically significant reduction, where the reduction is expressed by a positive percent reduction in the rate of decrease of $C_{max}$ and AUC, in a change in mirabegron absorption measured as a difference in $C_{max}$ and AUC in the fed and fasted states associated with the sustained release formulation

as compared to a difference in C$_{max}$ and AUC in the fed and fasted states associated with an immediate release formulation.

This section proceeds in three parts.  First, the Court discusses how the intrinsic and extrinsic record would teach the POSA how to measure reduced food effect.  Second, the Court discusses the intrinsic and extrinsic clues for determining when a reduction in food effect is clinically significant.  Third, the Court addresses the Generics Manufacturers' critiques of the construction and explains why they do not show indefiniteness by clear and convincing evidence at this stage in the litigation.

### 1. Measuring Reduced Food Effect.

First, measuring reduction of food effect using the difference in the rate of decrease for C$_{max}$ and AUC, between the immediate release and sustained release formulations is supported by both the intrinsic and extrinsic evidence.

### a. The 451 Patent Teaches the POSA to use the rate of decrease of AUC and C$_{max}$ to determine the existence of a food effect.

Specifically, the 451 Patent explains how to use the rate of decrease of AUC and C$_{max}$ to assess whether a food effect exists.  The claim itself does not provide a method for assessing food effect, so the Court looks to the specification.  *Phillips*, 415 F.3d at 1315.  The specification consistently discussed the food effect in terms of AUC and C$_{max}$ and refers to blood concentration studies utilizing these metrics.  For example, the Background Art indicates that "the pharmacokinetic data unexpectedly varied according to the presence or absence of food" and specifically refers to the high rate of decrease of C$_{max}$ and AUC.  D.I. 261-1 at 17.  The Solution to the Problem and Example 9 connect heightened C$_{max}$ and the observed heightened heart rate (the problem in the prior art).  *Id.* at 18 (Solution to the Problem), 38 (Example 9).  The Solution to the Problem discusses

the invention in terms of the pharmacokinetic profile of the drug. *See e.g.*, *id.* at 18 ("The present invention is characterized by providing a pharmaceutical composition of modified release capable of reducing the effects of food which was observed in formulations (conventional tablets) in which the releasing rate of the active ingredients was not controlled, by controlling the pharmacokinetic profile of the active ingredients."). Finally, the specification specifically indicates that food effect is measured using the rate of decrease in $C_{max}$ and AUC.[2] *See e.g.*, *id.* at 19 ("a method of inhibiting an increase in heart rate . . . wherein a rate of decrease of . . . []$C_{max}$[] thereof in comparison with a $C_{max}$ of a conventional formulation is 10% or more."). The specification instructs the POSA to calculate the rate of decrease using the equation provided below:

The rates of decrease of Cmax and AUC are calculated by the following equations:

$$Rd(Cmax) = [Cmax(FS) - Cmax(FI)] \times 100 / Cmax(FS)$$

$$Rd(AUC) = [AUC(FS) - AUC(FI)] \times 100 / AUC(FS)$$

Rd(Cmax): Rate of decrease of Cmax (%)
Cmax(FS): Cmax in administration in the fasted state
Cmax(FI): Cmax in administration after food intake
Rd(AUC): Rate of decrease of AUC (%)
AUC(FS): AUC in administration in the fasted state
AUC(FI): AUC in administration after food intake

*Id.* at 20. A POSA would understand that this calculation compares the key indicators across the fed and fasted state and that a larger number indicates a greater difference between the fed and fasted state. Crucially, the specification includes Example 10, a description of food effect study applying this method. *Id.* at 38. Based on blood samples

---

[2] The Generics Manufacturers argue that Astellas "ping pongs" between the rate of decrease calculation described in the patent versus the geometric mean calculation contained in the FDA food effect guidance. D.I. 260 at 44. The Court determines the rate of decrease calculation should control for two reasons. First, if the method for measuring an aspect of the claim is clear from the intrinsic record, the Court need not consider extrinsic evidence regarding other methods. *Phillips*, 415 F.3d at 1318–19. Second, Astellas disclaimed any argument that the geometric mean should be used to assess reduction in food effect. D.I. 264-1 at 6.

taken during food effect studies, the inventors compared the $C_{max}$ and AUC by calculating the rate of decrease.  *Id.*  Specifically, the inventors found:

| Formulation | Rate of Decrease of Cmax | Rate of Decrease of AUC |
|---|---|---|
| IR formulation | 67% | 47% |
| Example 1A (sustained release) | 4% | 10% |
| Example 1B (sustained release) | 10% | -4% |

*Id.* Based on the description of the rate of decrease calculation, the POSA would understand that the rates of decrease for the sustained release formulations were closer to zero meaning there was a lesser degree of difference between the sustained release and immediate release formulations.[3]  Therefore, based on the specification and Example 10, the POSA would understand that the rate of decrease for $C_{max}$ and AUC measured in blood concentration profiles are the key indicators for assessing mirabegron's food effect. Applying that teaching to Example 10, the POSA would observe a greater food effect in the immediate release formulation compared to the two sustained release formulations.

The method for assessing food effect using $C_{max}$ and AUC is supported by the extrinsic record.  While less reliable than intrinsic evidence, extrinsic evidence "can help the court determine what a person of ordinary skill in the art would understand claim terms to mean."  *Phillips*, 415 F.3d at 1319.  The primary guidance in the art, the FDA 2002 Food Effect Study Guidelines notes that blood concentration studies are the proper method and $C_{max}$ and AUC are two key pharmacokinetic variables used to assess food

---

[3] Dr. Taft's supplemental declaration cleared up some of the Court's confusion regarding the interplay between the rate of decrease for AUC in Examples 1A and 1B. Dr. Taft explained that because the rate of decrease involves ratios, the 10% result for AUC in example 1A and the -4% result in example 1B, are both close to zero, within the range of intersubject variability, and, therefore, indicate no food effect.

effect.  D.I. 261-3 at 10–12.  The parties' experts likewise agree that $C_{max}$ and AUC are the proper variables for measuring food effect, with a larger difference between fasted and fed states indicating a greater effect from food.  D.I. 261-1 at 369 ¶ 97, 714 ¶ 91 (Dr. Chambliss writing "[a]lthough a POSA would understand that a food effect could or could not result in a clinical impact, a POSA would be looking to understand the effect of food on a sustained release mirabegron tablet by analyzing pharmacokinetic parameters as discussed in the specification based on their general knowledge of the FDA Food Effect Guidance"); D.I. 261-3 at 14 ¶¶ 34–36 (Dr. Savic).  Therefore, the extrinsic evidence is consistent with Patent's choice to assess food effect using $C_{max}$ and AUC.

### b. The 451 Patent Teaches the POSA to use the percent reduction in the rate of decrease for $C_{max}$ and AUC to compare the food effect between formulations.

The 451 Patent also instructs the POSA how to compare the reduction in food effect across formulations.  Throughout the specification, the 451 Patent contemplates a comparison between rate of decrease observed in the immediate and sustained release formulations.  *See e.g.*, D.I. 261-1 at 18 ("The present invention provides for modified release . . . wherein a rate of decrease of . . . []$C_{max}$[] thereof in comparison with a $C_{max}$ of a conventional formulation is 10% or more.").  Example 10 compares the rate of decrease of the $C_{max}$ and AUC across the immediate release and sustained release formulations. *Id.* at 38.  Example 10 provides the rate of decrease for the sustained release formulation, which are significantly smaller than the rates of decrease for the immediate release formulations and concludes "the reductions of $C_{max}$ and AUC caused by food intake could be significantly alleviated by the pharmaceutical composition for modified release of the present invention."  *Id.*  Therefore, the inclusion of Example 10 would inform the POSA that the reduction in food effect was determined by comparing the rates of decrease

between fed and fasted $C_{max}$ and AUC under an immediate release and sustained release condition. The percent reduction of food effect referenced in the specification is calculated by taking: ((rate of decrease (immediate release formulation)—rate of decrease (sustained release formulation))/(rate of decrease (immediate release formulation)).[4] The percent reductions for Example 10 are calculated in the table below:

| Formulation | % Reduction in Rate of Decrease of $C_{max}$ | % Reduction in Rate of Decrease of AUC |
|---|---|---|
| Example 1A (sustained release) | 94% | 79% |
| Example 1B (sustained release) | 85% | 109% |

If the rate of decrease for the two measures in the sustained release condition is lower than the rate of decrease in the immediate release formulation, the food effect is reduced.[5] Therefore, if the percent reduction in rate of decrease is positive, the food effect has been reduced, and if it is negative, the food effect has not been reduced. Therefore, the intrinsic evidence teaches the POSA how to compare the food effect across formulations and determine when it has been reduced.

---

[4] Dr. Taft applied this calculation in his supplemental declaration. *See* D.I. 261-4 at 31, ¶ 21. The Court concludes that Dr. Taft used a basic statistical calculation and the POSA would know how to calculate this value without being provided the formula in the 451 Patent.

[5] In contrast, if the sustained release formulation had the same rate of decrease you would expect to see a 0% reduction in the rate of decrease (indicating no reduced food effect) and if the food effect was greater in the sustained release formulation, you would expect to see a negative percent reduction in the rate of decrease. For example, consider two formulations: Formulation A (an immediate release formulation) with a $C_{max}$ rate of decrease of 67%, and Formulation B (a sustained release formulation) with a $C_{max}$ rate of decrease of 80%. The higher rate of decrease in Formulation B, means there was greater variation between $C_{max}$ in the fed and fasted states. In this example, the percent reduction in rate of decrease of $C_{max}$ is approximately -19.4%, meaning there was *increased* food effect.

**2. The 451 Patent teaches the POSA that the clinical significance of a reduction in food effect is determined by reference to the problem in the prior art and sets an objective baseline of a 10% reduction in rate of decrease of C$_{max}$.**

The 451 Patent contains sufficient guidance to allow the POSA to understand when a reduction is clinically significant. Specifically, a POSA would understand that reduced food effect must be assessed with reference to the clinical problem and an incidental reduction in food effect that was not accompanied by clinical benefit would not fall within the scope of the patent.

The 451 Patent consistently ties its explanation of the reduced food effect to the alleviation of a set of specific symptoms, namely the heightened heart rate associated with the immediate release formulation. D.I. 261-1 at 50–51, ¶¶ 24–26. Example 9 found a positive correlation between heightened heart rate and C$_{max}$ concentration. D.I. 261-1 at 39, 15 fig. 11. Indeed, the solution to the problem describes the invention as "preventing the occurrence of adverse events that it can be used to anticipate, such as an increase in heart rate by controlling C$_{max}$." D.I. 261-1 at 18. The advantageous effect of the invention is described as "the present invention can control C$_{max}$ in a fasted state to a specific value or less, C$_{max}$ can be reduced to a specific value or less even at a single dose per day, and adverse events, such as an increase in heart rate, can be anticipated and prevented in advance." Id. at 19. Moreover, Example 10, demonstrates that the sustained release formulation accomplished that goal, noting that the reduction in food effect observed in the comparative study was associated with a lowered increase in heart rate in the fast state. Id. at 38. Confirming the relationship between lowering increase in heart rate and the pharmacokinetic measures, during the prosecution history, Astellas disclaimed an earlier draft of the claim that would have suggested that the food effect was

a separate condition to be treated.  D.I. 261-2 at 100.  This confirms that reduction in food effect should be read in conjunction with the clinical benefits of the reduced food effect.

Therefore, a clinically significant reduction in food effect both shows reduced food effect as discussed *supra* Sections III.C.1-2 and an improvement of the heightened heart rate symptoms that plagued the prior art.  For the purposes of infringement analysis, clinical significance can be demonstrated by pharmacokinetic studies addressing the alleged infringing products impact on increased heart rate and/or expert testimony addressing whether the allegedly infringing product addresses the clinical problem of heightened heart rate caused by a spike in mirabegron in the blood stream.  The Court next turns to whether the association between reduction in food effect and clinical benefit renders the claim indefinite.

### 3.  "Reduced food effect" is not indefinite.

The patent contains sufficient information to inform the POSA what constitutes a clinically significant reduction in food effect.  Terms of degree are not indefinite if the intrinsic evidence provide objective baselines for the POSA to use to assess infringement. *Guangdong Alison Hi-Tech Co. v. Int'l Trade Comm'n*, 936 F.3d 1353, 1363 (Fed. Cir. 2019).  Examples from the specification can demonstrate objective boundaries without rising to the level of a definition for the claim. *Id.*  For example, in *Guangdong*, the Federal Circuit concluded the term "sufficiently resilient" was rendered definite by including an example in the specification indicating "after compression for a few seconds it will return to at least 70% of its original thickness." *Id.* at 1363.  Here, the intrinsic evidence provides a 10% reduction in rate of decrease of $C_{max}$ as an objective baseline for assessing whether reduction in food effect is clinically significant.  Specifically, throughout the description of the invention, the 451 Patent refers to "a rate of decrease of . . . []$C_{max}$[]

thereof in comparison with a $C_{max}$ of a conventional formulation is 10% or more." *See e.g.*, D.I. 261-1 at 18–19, ¶¶ 3, 12, 21. The presence of the 10% reduction in the rate of decrease in $C_{max}$ baseline in the solution to the problem suggests that 10% is an objective base line for establishing a sufficiently significant reduced food effect.[6]  Therefore, a POSA would have sufficient guidance to determine whether a reduction in food effect is clinically significant.[7]

The extrinsic evidence supports the conclusion derived from the intrinsic evidence that the POSA would understand and be able to apply the reduced food effect term in the context of infringement analysis.  First, the prosecution history demonstrates that the examiner who reviewed the patent did not express any concerns about the definiteness of the reduced food effect term.  *See Sonix Technology Co.*, 844 F.3d at 1380.  Moreover, the Generics Manufacturers' experts suggested they would be able to apply the reduced food effect term in infringement analysis in depositions.  For example, Dr. Kaspar applied the reduced food effect term to conduct noninfringement analysis.  *See* D.I. 261-4 at 267–69; *see also* D.I. 261-1 at 96: 4–9 ("Q. And your opinion is that a POSA would understand the claim sufficiently to be able to make a validity determination of obviousness or an infringement determination in this case, cored?  A. That's correct.").  Likewise, in Dr.

---

[6] The Court concludes the POSA would use the 10% reduction as a baseline, rather than the 20% and 30% reductions referred to in the enablement section because the 10% baseline is used throughout the specification, while the other measures only appear in alternative embodiments.  *Compare* D.I. 261-1 at 18–19, ¶¶ 3, 12, 21 (10% reduction appearing throughout the Solution to the problem) with D.I. 261-1 (20% and 30% appearing as alternative embodiments).  Effectively, these unclaimed embodiments left open the possibility of claiming a sustained release formulation that does an even better job of reducing food effect rather than setting an objective floor for a clinically significant reduction.

[7] Currently, the Court declines to incorporate the 10% objective baseline into its claim construction.  As recognized in *Guangdong* examples in the specification can defeat indefiniteness without being incorporated into the claim 936 F.3d at 1363.  The Court does not conclude that 10% is the magic cutoff for clinical significance.  Rather, the Court concludes the use of the 10% reduction across the specification provides sufficient objective guidance to avoid indefiniteness.

Chambliss's declaration, despite disagreeing that the patent provided sufficient guardrails, recognized reduced food effect in examples from the prior art. *See e.g.* D.I. 261-1 at 672, ¶ 174 ("A POSA reading Chapple 2005 in March 2010 would have recognized Chapple 2005 to teach that the tamsulosin OCAS tablets demonstrated a reduced food effect, including a reduction in $C_{max}$, in comparison to an immediate release formulation of tamsulosin."). Like in *Sonix*, "continued application by the experts in this case further supports the conclusion that a skilled artisan did understand the term with reasonable certainty." 844 F.3d at 1380.

In sum, as constructed, the intrinsic evidence of the patent, supported by relevant extrinsic evidence, demonstrates a method for determining reduced food effect, principles to guide the POSA in assessing clinical significance, and concrete examples setting objective baselines for review. This means infringement is not left to the "unpredictable vagaries of any one person's opinion." *Dow Chemical Co.*, 803 F.3d at 635. Therefore, the claim is validly constructed and not invalid for indefiniteness on the present record.

### 4. The Generics Manufacturer's indefiniteness arguments.

The Generics Manufacturers raise several arguments for why the reduced food effect term is, nevertheless, indefinite. The primary theories are: (1) Astellas's claim construction theory has changed across the litigation, (2) the intrinsic evidence contains multiple contradictory definitions of reduced food effect, (3) Example 10 does not contain enough information to allow the POSA to reconstruct the study or compare results across studies. The Court addresses each in turn.

First, while perhaps not ideal litigation strategy, Astellas's changes in position regarding the proper construction of "reduced food effect" appears to be good faith engagement with issues raised by the Generics Manufactures and Judge Burke. For

example, in response to Judge Burke's holding that Astellas's earlier constructions were insufficiently objective, Astellas's current position ties the pharmacokinetic measures used in the patent to the patent terms.  *Compare* D.I. 200 at 23 (Judge Burke criticizing Astellas's failure to propose a single objective construction of reduced food effect based on the intrinsic evidence) *with* D.I. 250 at 31–32 (stating "Astellas now provides the clarification needed to alleviate the Court's concerns" and proposing a new construction based on the pharmacokinetic parameters).  Therefore, Astellas's shifting positions, standing alone, are not a basis to find indefiniteness by clear and convincing evidence.

Second, the Court is unconvinced by the Generics Manufacturers' lexicography arguments regarding the alternative definitions of the term reduced food effect for the same reasons as Judge Burke.  D.I. 200 at 16–20.[8] Specifically, by including multiple definitions, Astellas failed to define the term with "reasonable clarity, deliberateness, and precision" and the Court looks elsewhere in the intrinsic evidence to define the term.  *See Abbott Lab'ys v. Syntron Bioresearch, Inc.*, 334 F.3d 1343, 1354 (Fed. Cir. 2003).

Third, the Court agrees that the Generics Manufacturers have raised compelling concerns regarding the level of detail contained in Example 10, but the record does not demonstrate objective evidence of those concerns.  Specifically, the Generics Manufacturers raise concerns about the statistical methods used to conduct cross-study comparisons[9], study population, and dosage.[10]  *See* D.I. 260 at 40–42.  Astellas argues

---

[8] The Court agrees with Judge Burke that this portion of the 451 Patent muddies rather than clarifies the meaning of reduced food effect.  *See* D.I. 200 at 21–22.  However, here, unlike at the preliminary injunction stage, Astellas has provided a usable construction.

[9] The Generics' Manufacturers' argument that the 451 Patent does not comport with statistical best practices strikes the Court as an argument regarding the ability of Astellas to prove infringement rather than an argument that the claim is indefinite.

[10] The Court agrees with Judge Burke that the POSA would understand to use a high fat meal, consistent with the FDA guidance on the issue.  D.I. 200 at 30.

these details can be filled in based on the POSA's knowledge of best practices and, in any event, variation caused by these factors does not impact the ability to compare study results for the purpose of infringement analysis.  *See* D.I. 260 at 39–43; D.I. 273 at 12–13.  At this stage, the Generics Manufacturers have produced evidence that these missing study parameters may have an impact on the key outcomes but have not shown clear and convincing evidence that changing these parameters meaningfully impacts the absorption profile of mirabegron or renders cross-study comparison to determine infringement impossible.  *See* D.I. 261-4 at 293 ¶¶ 21–22 (identifying variation in the food effect studies but not tying it to a specific missing parameter); *id.* ¶ 23 (noting the POSA would "expect . . . that dose will matter for some formulations" but not providing any evidence demonstrating dose dependence); *id.* ¶ 24 ("Each of these phenomena *could* affect the results when comparing a sustained release mirabegron formulation to an immediate release formulation to determine whether there was a reduction in food effect . . ..") (emphasis added).  Therefore, they presently have failed to show indefiniteness.  *Ball Metal Beverage Container Corp. v. Crown Packaging Tech., Inc.*, 838 F. App'x 538, 542 (Fed. Cir. 2020) ("the mere possibility of different results from different measurement techniques does not render a claim indefinite").

Moreover, as demonstrated by the competing expert testimony on these issues, the significance of the omitted parameters and the POSA's ability to design a study based on the information provided in Example 10 are a fact issues best resolved by the jury.  *Compare* D.I. 261-4 ¶ 24 (Dr. Savic indicating study population and dose may impact $C_{max}$ and AUC) *with* D.I. 261-4 at 38–40, ¶¶ 39–44 (indicating the omitted parameters did not impact $C_{max}$ and AUC); *Bombardier Recreational Prod. Inc. v. Arctic Cat Inc.*, 785 F. App'x

23

858, 867 (Fed. Cir. 2019) (recognizing that indefiniteness turning on fact disputes is amenable to resolution by jury).[11]  Finally, the Court recognizes that evidence regarding the significance of omitted study parameters may be developed as the parties engage in infringement analysis. The Generics Manufacturers are welcome to reraise these issues at summary judgment and trial if their concerns about Example 10 are borne out in discovery.

In sum, a POSA would understand a particular formulation of mirabegron to exhibit a reduced food effect when: (1) comparison of the sustained release and immediate release formulations demonstrates a positive percent reduction in rate decrease of $C_{max}$ and AUC, and (2) the formulation shows the corresponding clinical benefit by alleviating the negative side effects associated with the immediate release formulation (guided by the patent's 10% reduction benchmark).  Given that the metes and bounds of the claim are determinable from the intrinsic and extrinsic evidence, the Court does not find the claim indefinite at this stage.  The Court acknowledges the breadth of the claim may raise validity concerns and the Generics Manufacturers are not precluded from arguing those contentions at summary judgment or trial.

### 5. "Immediate release formulation."

The Court concludes that the term "immediate release formulation" should be constructed using Astellas's proposed alternative construction "immediate release formulation of Comparative Example 1."  The POSA would understand both what an immediate release formulation is as a general matter and, presumably, the specific immediate release formulation was used to make the comparison in Example 10.

---

[11] To the extent the issues identified by the Generics Manufacturers preclude a finding of infringement, they are welcome to raise those issues at summary judgment and at trial.

On the intrinsic side, the patent specification addresses the meaning of immediate release formulation. "[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp.*, 90 F.3d at 1582. Here, the 451 Patent was created as an improvement over the prior art, the previously patented immediate release mirabegron formulation. The patent specification contrasts the patented modified release formulation with "formulations (conventional tablets) in which the releasing rate of active ingredients was not controlled." D.I. 261-1 at 18. The conventional tablet or immediate release formulation is then described in greater detail in Comparative Example 1. *Id.* at 34. Therefore, the Court concludes, based on the language of the specification, that the POSA would understand what an immediate release formulation is and the features of the specific immediate release formulation that was used as a comparison point in the study described in Example 10.

Expert testimony provided by Astellas, and the Generics Manufacturers confirms that the POSA would understand the meaning of "immediate release formulation" and that the immediate release formulation described in Example 10 was the formulation described in Comparative Example 1. At the preliminary injunction hearing, Astellas's expert, Dr. Taft, testified that an immediate release formulation is a formulation that "does not control the release of the drug substance." *See* D.I. 261-1 at 99:23–100:9. Astellas's expert, Dr. Little, adopted a similar definition describing an immediate release formulation as "a formulation that is not intended to control the release of the drug when taken orally." D.I. 261-1 at 264, ¶ 62. Similarly, the Generics Manufacturer's expert, Dr. Chambliss, quoting FDA guidance, described "[a]n immediate release oral dosage form allows the

drug to dissolve in the gastrointestinal contents with no intention of delaying or prolonging the dissolution or absorption of the drug." D.I. 261-1 at 630, ¶ 77.  Moreover, the experts understood that, in the context of the 451 Patent, the references to an immediate release formulation referred to the formulation described in Comparative Example 1.  *See* e.g., D.I. 261-4 at 29 ¶ 16 (Dr. Taft); D.I. 251-1 at 249 ¶ 26 (Dr. Little); D.I. 261-1 at 691 ¶ 232 (Dr. Chambliss recognizing Comparative Example 1 as the immediate release formulation used in Example 10 but criticizing lack of dissolution data).  Therefore, the intrinsic evidence, reflected in the specification, and the extrinsic evidence, reflected in expert testimony and FDA guidance reflect that the POSA would know what an "immediate release formulation" is and look to Comparative Example 1 to establish a point of comparison for the analysis of reduced food effect.

The Generics Manufacturers counter with two indefiniteness arguments: (1) Astellas engaged in lexicography and adopted conflicting definition of the term, and (2) Astellas failed to identify the proper comparator immediate release formulation.  The first argument fails because Astellas did not engage in lexicography.  The second point fails because the 451 Patent provides a specific immediate release formulation that was used as a comparator in Comparative Example 1.

The Generics Manufacturers' lexicography argument fails because the referenced embodiments are not sufficiently clear, deliberate, and precise to constitute a definition of the term. [12] While an inventor is free to specifically define terms in their patent, the lexicography must be made with "reasonable clarity, deliberateness, and precision."  *See*

---

[12] Astellas claims, in the alternative, that this portion of the description of the embodiments should not be considered in claim construction because the embodiments related to dissolution testing that were disclaimed during the patent prosecution process.  D.I. 260 at 49–50.  Because the Court concludes Astellas did not successfully engage in lexicography, it does not reach this alternative argument.

*Abbott Laboratories*, 334 F.3d at 1354.  For example, in *Abbot Labs*, the patent at issue defined the term "analyte" in two different ways and, rather than using either of the two definitions, the district court instructed the jury with the ordinary meaning of the term.  *Id.* at 1354.  The Federal Circuit affirmed, holding "[b]ecause the specification provides two alternative definitions for the term at issue, the specification does not define the claim term" and the plain meaning of the term was the appropriate claim construction.  *Id.* at 1355.  Here, the relevant section of the specification provides:

> The term "immediate release formulation (conventional formulation)" as used herein means a formulation in which the dissolution rate of the drug from the formulation is 85% or more after 30 minutes from the beginning a dissolution test, which is carried out in accordance with a dissolution test (paddle method) described in the United States Pharmacopia under the conditions that 900 mL of an appropriate test fluid (such as a UP buffer, P.H. 6.8) is used and the paddle rotation speed is 100 rpm. Alternatively, the term means a formulation in which the dissolution rate of the drug from the formulation is 85% or more after 30 minutes from the beginning a dissolution test, which is carried out in accordance with a dissolution test, method 2 described in the Japanese Pharmacopoeia under the conditions that 900 mL of appropriate test fluid (such as a McIlvain [sic] buffer, pH 6.8) is used and the paddle rotation speed is 50 rpm. Alternatively, the term means a formulation in which the dissolution rate of the drug from the formulation if 85% or more after 30 minutes from the beginning a dissolution test which is carried out in accordance with a dissolution test method 2 (paddle method) described in the Japanese Pharmacopoeia under the condition that 900 mL of a USP phosphate buffer (pH 6.8) is used as a test fluid and the paddle rotation speed is 200 rpm.

D.I. 261-1 at 20.  The Generics Manufacturers argue that this embodiment is an attempt to attach a fixed, technical meaning to the term "immediate release formulation."  While the text of the embodiment contains definitional language ("as used herein means") the "definitions" are preceded by the term "alternatively" indicating they are being used as examples of or alternative meanings for the same term.  This suggests that Astellas was not trying to create a limiting definition, but rather using examples to demonstrate the

breadth of the claim.  Moreover, as the Generics Manufacturers recognize, the different tests discussed in the embodiments, may come to different conclusions about whether specific formulations are immediate release formulations.  Given the existence of multiple possible definitions in the embodiment, *Abbot Labs.* controls and any lexicography implied by the definitional language was not made with "reasonable clarity, deliberateness, and precision."  *Abbott Laboratories*, 334 F.3d at 1354.  Therefore, the proper course here is not to declare that Astellas successfully engaged in lexicography, adopted an internally inconsistent definition, and, by extension, an indefinite term. Rather, Astellas did not use the enablement to adopt a limiting definition of "immediate release" formulation distinct from the term's ordinary meaning and the Court must look elsewhere in the intrinsic evidence.

The Generics Manufacturers' second argument, that "immediate release formulation" is indefinite because it lacks a comparator, is inconsistent with the intrinsic record.  Certainly, a claim that requires a comparison point and fails to provide one may be indefinite. *Liberty Ammunition, Inc. v. United States*, 835 F.3d 1388, 1395 (Fed. Cir. 2016) ("Terms of degree are problematic if their baseline is unclear to those of ordinary skill in the art.").  However, when the patent provides a specific comparator, it avoids the indefiniteness issues.  *Id.*  For example, in *Liberty Ammunition*, the Federal Circuit addressed a claim for a bullet with a "reduced area of contact" with the rifling of a gun. *Id.*  Recognizing the term "reduced area of contact" called for a comparison the Court reviewed the language of the specification and determined that a specific bullet, referenced in the specification, was the proper point of comparison, avoiding indefiniteness.  *Id.*  Here, the 451 Patent discloses exactly what immediate release

formulation was used to make the comparison in Example 10.  Therefore, even if the type of immediate release formulation affected the absorption profile of mirabegron, the patent has adopted a specific intrinsic comparator, thus the claim is not indefinite under *Liberty Ammunition*.

There is another lurking issue under *Liberty Ammunition*.  There, the court determined that the specific round identified in the specification must be used as the comparator, because the range of possible comparators identified by the district court resulted in a scattershot infringement finding based on the comparator used.  835 F.3d at 1398.  Here, while the Generics Manufacturers' experts identify that the contents of an immediate release formulation may impact the results of food effect studies, there is currently no evidence in the record demonstrating that the chemical differences between different types of immediate release formulations affect the key absorption metrics of mirabegron used to measure a reduced food effect (the relative ratios between $C_{max}$ and AUC in fed and fasted states).  *See* D.I. 261-1 at 582, at 325:8–16; D.I. 261-3 at 201, at 276:6–15; D.I. 261-3, at 202, 280:9–281:20 ("Q: Do you cite to any data showing that any minor changes to a conventional formulation of mirabegron would alter the in vitro and in vivo dissolution rates?  A: . . . I don't have any data specifically on mirabegron, but . . . [e]ffect on formulation is going to be more dramatic on mirabegron than it would be on an active that is highly water soluble and highly permeable); D.I. 261-3 at 694, 199:2–22 (Dr. Savic testifying that formulation type is a "potential source of variation that must be controlled" but not citing any studies regarding mirabegron).  However, the Court is cognizant of the potential for wasted time and effort should the immediate release formulation used impact the dissolution profile of the drug.  Recognizing that Comparative

Example 1 is the best comparator, supported by the intrinsic evidence, Astellas proposes an alternative construction focusing on Comparative Example 1. D.I. 260 at 57; D.I. 304-1 at 54. The Court determines this is the best course. Using Comparative Example 1 will ensure the parties and their experts are on the same page when conducting infringement analysis and avoid potential indefiniteness issues.

The Generics Manufacturers did not propose a construction of "immediate release formulation" and have not shown that Astellas's proposed construction is indefinite by clear and convincing evidence. Therefore, the Court adopts Astellas's alternative proposed construction, "immediate release formulation of Comparative Example 1."

### 6. "Continuous drug release for at least four hours after oral administration."

The Court concludes that the term "continuous drug release for at least four hours" should be given its plain and ordinary meaning. The parties generally agree that the claim has a plain meaning "continuous drug release for at least four hours *in vivo* after oral administration." Neither party points to intrinsic nor extrinsic evidence indicating that Astellas adopted some other meaning for the term. Given that the parties agree on that the term has a plain meaning and that the plain meaning is appropriate here, the Court has nothing further to decide at this stage. *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1319 (Fed. Cir. 2016) ("[A] a district court's duty at the claim construction stage is, simply . . . to resolve a dispute about claim scope that has been raised by the parties."). Therefore, the Court will use the term's ordinary meaning.

Despite agreeing that "continuous drug release for at least four hours after oral administration" has a plain meaning, the Generics Manufacturers argue that the term is, nevertheless, indefinite because a method to directly measure *in vivo* drug release does

not exist. D.I. 260 at 62. The Federal Circuit has addressed this type of argument writing when "'the claim language does not require a particular form of testing, this inquiry is not a claim construction question'" rather it is a "a factual question of infringement for the jury." *ADC Telecommunications, Inc. v. Switchcraft, Inc.*, 281 F. App'x 989, 992 (Fed. Cir. 2008) (quoting *Union Carbide Chemicals & Plastics Tech. Corp. v. Shell Oil Co.*, 425 F.3d 1366, 1377 (Fed. Cir. 2005) (en banc)). The Generics Manufacturers do not point to any language in the 451 Patent requiring the continuous four-hour release to be directly measured by *in vivo*. In fact, the patent specification and extrinsic record reveal several commonly used methods that scientists in the field use as proxies for the measurement of drug release *in vivo*, including standard pharmacokinetic testing. In response, the Generics Manufacturers argue that these methods do not accurately measure continuous drug release in vivo. This is the quintessential argument regarding the method for establishing infringement. The Generics Manufacturers will have ample opportunity to argue before the jury whether Astellas's proposed measures for continuous drug release are accurate measures. However, these arguments do not establish that the claim is indefinite.

## IV.     CONCLUSION

In sum, the Court concludes, at this stage of the litigation, that the Generics Manufacturers have not met their burden to show indefiniteness by clear and convincing evidence.

THEREFORE, IT IS ORDERED:

1. The Parties Motions for Claim Construction (D.I. 110 and D.I. 111) are GRANTED.

2. The Court adopts the following construction for the disputed terms:

| Reduced food effect | A clinically significant reduction, where the reduction is expressed by a positive percent reduction in the rate of decrease of $C_{max}$ and AUC, in a change in mirabegron absorption measured as a difference in $C_{max}$ and AUC in the fed and fasted states associated with the sustained release formulation as compared to a difference in $C_{max}$ and AUC in the fed and fasted states associated with an immediate release formulation. |
|---|---|
| Immediate Release Formulation | Immediate release formulation of Comparative Example 1. |
| Continuous drug release for at least four hours after oral administration. | Plain meaning (continuous drug release for at least four hours *in vivo* after oral administration). |

Dated this 30th day of October 2024.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge